**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ST. PHILIP NERI CATHOLIC CHURCH, INDIANAPOLIS, INC., and ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS PROPERTIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INDIANAPOLIS HISTORIC PRESERVATION COMMISSION, and THE METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY, <br><br> Defendants. | Case No. 1:25-cv-02616-MPB-TAB <br><br> **FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT

Plaintiffs St. Philip Neri Catholic Church Indianapolis, Inc. ("St. Philip Neri") and Roman Catholic Archdiocese of Indianapolis Properties, Inc. ("Archdiocese Properties"), by counsel, and for their Complaint state:

## NATURE OF ACTION

1.      The Plaintiffs, ST. PHILIP NERI and ARCHDIOCESE PROPERTIES, bring this action to redress injuries caused by the Defendants' unlawful landmarking of the Plaintiffs' church building and property and refusal to permit it to demolish their structures, which has been relegated (the process by which a church is "desacralized" or turned over to limited secular use—profane, but not "sordid" or unbecoming—by Canonical decree of the competent hierarchical authority), and is no longer used by the Church.  The actions of Defendants prevent Plaintiffs from demolishing the unused and unusable church building and property, and require them to either maintain it at great expense, or find a buyer for the church building and accept the risk that in the

1

future the building could be put to forbidden use in violation of Roman Catholic laws, rules, regulations and doctrine.  Both alternatives impose grave and substantial burdens on the Plaintiffs' religious exercise in violation of federal civil rights law and the United States Constitution, as well as state law.

2.      Further, in their landmarking of the Plaintiffs' church and accessory buildings, and subsequent denial of a certificate of appropriateness to allow the demolition of the church and rectory, Defendants intruded on Plaintiffs' religious doctrine and violated their religious autonomy, as evidenced by numerous statements by Defendants' officials opining on Roman Catholic doctrine and substituting their views on religious matters for those of the Plaintiffs, in violation of the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over all federal claims in the First Amended Complaint as arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. §§ 2000cc, *et seq.*, which confer original jurisdiction on United States District Courts in suits to redress the deprivation of rights, privileges and immunities, as stated herein.  This Court has pendent and supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).  This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4.      Venue lies in this District pursuant to 28 U.S.C. § 1391.  All Defendants and Plaintiffs are located in this District. All events giving rise to this action occurred in this District.

## PARTIES

5.    At all times mentioned herein, Plaintiff ST. PHILIP NERI is a beneficiary of the Roman Catholic Archdiocese of Indianapolis Properties, Inc. Revocable Real Estate Trust Agreement ("Trust").  Roman Catholic Archdiocese of Indianapolis Properties, Inc. holds title to the real estate located at 125 N. Oriental St., Indianapolis, Indiana 46202 (the "Subject Property"), as Trustee for ST. PHILIP NERI, which possesses an equitable interest in the Subject Property.

6.    Plaintiff ARCHDIOCESE PROPERTIES is an Indiana non-profit corporation that serves as a real estate trustee for Catholic parishes within the geographic scope of the Roman Catholic Archdiocese of Indianapolis ("Archdiocese"), and has an address of 1400 N. Meridian Street, Indianapolis, Indiana 46202.

7.    Defendant INDIANAPOLIS HISTORIC PRESERVATION COMMISSION (the "IHPC") is an agency of the City of Indianapolis a/k/a Consolidated City of Indianapolis (the "City") created and existing by virtue of the laws of the state of Indiana.

8.    The IHPC is empowered by the state to act through its officials.

9.    The IHPC is empowered by the laws of the state of Indiana to establish and maintain a register of historic properties in Marion County, Indiana, and to prepare an historic area preservation plan for historic areas of Marion County, and to recommend the plan to the Metropolitan Development Commission for adoption as part of the Comprehensive Plan for Marion County.

10.    Defendant METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY (the "MDC") is an agency of the City, created and existing by virtue of the laws of the state of Indiana.

11.    The MDC is empowered by the state to act through its officials.

3

12.    The MDC is empowered to, by virtue of the laws of the state of Indiana, amend the Comprehensive Plan for Marion County, Indiana, by adopting historic area preservation plans as recommended by the IHPC.

## **STATEMENT OF FACTS**

### St. Philip Neri Catholic Parish and Its Religious Exercise

13.    St. Philip Neri Catholic Church, Indianapolis, Inc. ("St. Philip Neri") is a parish of the Roman Catholic Church and falls within the authority of the Archdiocese of Indianapolis.

14.    The Roman Catholic Church is a hierarchical church, in that its polity requires that all its powers of governance be held and exercised by the presiding Bishop or Archbishop of a particular Diocese or Archdiocese, subject to the religious doctrines and related internal laws of the Church, which are referred to as Canon law.

15.    St. Philip Neri is a constituent entity within the Archdiocese of Indianapolis, which has been charged with the obligations and benefits of certain Real Estate located at The Subject Property.

16.    St. Philip Neri has an equitable ownership interest in the Subject Property.

17.    Church doctrine and Canon law impose tenets of faith, rules, laws, limitations and obligations on lay faithful and Catholic houses of worship, as well as on hierarchs such as the Archbishop and the Pastor of St. Philip Neri, who have authority over them.

18.    When a Catholic church is constructed, it is dedicated to God and to the worship of God and the sanctification of its members.

19.    In or around 1895, the Archdiocese established Holy Cross Church ("Holy Cross") in response to a growing population of Irish and German Catholics in east Indianapolis, who had settled in the area during the mid-to-late Nineteenth Century.

20.     The Archdiocese purchased land at the intersection of Ohio and Oriental Streets on the east side of Indianapolis, now known as 125 N. Oriental St., Indianapolis, IN 46202 (the "Subject Property") to construct a home for Catholic priests residing at Holy Cross.

21.     The Subject Property is owned by Archdiocese Properties pursuant to the Trust.

22.     The Archdiocese also founded a religious day school and established a convent for the Sisters of Providence, who ran the school, at the Subject Property in 1896.

23.     The Holy Cross congregation and school grew throughout the first half of the Twentieth Century, reaching 3,000 parishioner families from about 1925, and approximately 400 to 500 students during that time.

24.     The early growth of the Holy Cross parish and related schools led to the construction of four buildings on the Subject Property between 1902 and 1948: the Holy Cross School Building (the "School Building"), the Church of the Holy Cross Church Building (the "Church Building"), the Church Rectory, and Fatima Hall/Kelley Hall ("Kelley Hall"), which was used as a parish hall and gymnasium.

25.     The School Building was built in 1902 to include the school and a convent for the residence of the nuns who ran the school.

26.     The Holy Cross School ceased operations in 2023 and the School Building has sat vacant since then.

27.     The existing Church Building on the Subject Property was built in 1922 in the Renaissance Revival style with limestone masonry.

28.     The Church Building included exterior religious architectural details reflecting its Roman Catholic faith and are explicitly and deliberatively designed to communicate and identify

the structure to all as a Roman Catholic Church, to praise God and to exhort those who see it, whether Roman Catholic or not, to reflect upon Jesus Christ and the Word and Glory of God.

29.    These architectural details include pointed arch stained-glass windows, a 136-foot tall bell tower ornamented with two large limestone crosses, a front facade also topped with a large limestone cross, and etchings across the front of the building identifying the structure as the Holy Cross Church.

30.    The Church Building is in a serious state of deterioration.  The limestone masonry was constructed using metal anchors which have rusted and compromised the structural integrity of the building.  It has also allowed water to infiltrate the structure causing water damage to the Church Building.

31.    The Church Rectory was built in 1910 and renovated in 1948 and 1954, including an addition in 1954.

32.    Kelley Hall was built in 1948.

33.    Archdiocese Properties is the Trustee for the Subject Property and all related structures.

34.    The Holy Cross Church declined in membership following World War II.

35.    In or around December 2012, then-Archbishop of Indianapolis Daniel Mark Buechlein instituted an internal planning process to assess the pastoral needs of the parishes of the Archdiocese of Indianapolis, which became known as "Connected in the Spirit."

36.    The Connected in the Spirit team, which included the Archdiocesan Planning Commission and the Archbishop, reviewed parish data and ascertained that:

        a.    "The [Church Building] is in need of significant structural repairs and there is no reserve funding available to pay for the necessary repairs;

b.  while there may be some potential for growth in membership in the parish, it is insufficient to generate funds sufficient to finance the necessary repairs on the [Church Building];

c.  the sacramental records for the parish, while not complete, suggest that there is little if any growth in the numbers of baptisms, adults entering the Church through the RCIA program, or weddings in the parish; and

d.  there is a need for and a potential for enhanced collaborative ministry in the parish should the Church of the Holy Cross Parish be merged with St. Philip Neri Parish; . . . ."

37.    On May 21, 2014, then-Archbishop of Indianapolis Joseph William Tobin issued a merger decree, known canonically as an extinctive union, between the Church of the Holy Cross and St. Philip Neri (the "Merger Decree").

38.    The purpose of the Merger Decree was to, *inter alia*, "allow for stronger evangelization, faith formation, and vocations programs, as well as effective administration and stewardship of the resources of the unified parish" and "allow for a pastorally necessary allocation of limited resources and personnel, particularly priests."

39.    The canonical effect of the Merger Decree was the formal extinction of the Parish of the Holy Cross, and all parishioners of Holy Cross becoming parishioners of St. Philip Neri. Also under the Merger Decree, all the assets and liabilities of the Church of the Holy Cross were transferred to St. Philip Neri.

40.    After the Merger Decree took effect on November 30, 2014, St. Philip Neri continued to hold Mass in the Church Building.

41.    In 2015, the portico of the Church Building collapsed with debris falling onto the Subject Property as well as onto Ohio Street.   The collapse caused damage to the front steps and sidewalk.  The area was cordoned off and remains so today.

42.    Given the poor structural condition of the improvements, the Archdiocese stopped using the Subject Property for religious purposes and fenced it off from public use.

43.    St. Philip Neri has solicited bids for the repair and renovation of the Church Building located on the Subject Property, and has received estimates that it will cost between $7.5 million and $8.5 million to repair and renovate the buildings to a usable condition.

44.    St. Philip Neri cannot afford the costs for such repair and renovation.

45.    Due to the deteriorating condition of the Church Building, St. Philip Neri has not been able to use the Church Building for religious purposes and has fenced it off from the public.

46.    On February 24, 2019, the pastor of St. Philip Neri, after consulting with his finance and pastoral councils, requested that Holy Cross Church be relegated to profane but not sordid use, a process also known as deconsecration.

47.    On May 11, 2019, Archbishop Charles Coleman Thompson determined there was a sufficiently grave reason and issued a Decree relegating the Church Building to profane but not sordid use ("Relegation Decree").

48.    Catholic Canon law imposes on the Archbishop specific obligations regarding the protection and reuse of religious symbols located in the interior or upon the exterior of Churches that are deconsecrated and relegated to profane but not sordid uses, including, in certain instances, an obligation to safeguard religious symbols to prevent use and display in a fashion inconsistent with their sacred nature.

49.     Once relegation occurs, but prior to a church property being converted to an acceptable profane use, all sacred objects within a church are catalogued and removed from the church for continued sacred re-use with a welcoming parish or other Catholic church or buildings.

50.     Consistent with these obligations, and following the Relegation Decree, sacred consecrated hosts, relics, the altar, stained-glass windows, and sacred art was removed from the interior of the building.

51.     Because of the unconstitutional interference by the City and its IHPC, one side altar, the consecrated bells, and a few stained-glass windows remain and are now unable to be removed due to the historic designation.

52.     The stained-glass windows of the Church Building removed prior to the historic designation were sent to a Catholic Church in southern Indiana.

53.     Certain religious features or aspects including details such as Chi Rho reliefs on the doors, and inscriptions on the exterior of the building, as well as the inextricable connection between Holy Cross Church and the Catholic faith, cannot be simply removed.

54.     The multiple limestone crosses, along with the large bell tower, are religious expressions by the Catholic Church to all who see them.

55.     The continued maintenance of the unusable Subject Property forces St. Philip Neri to incur substantial costs, which is a significant portion of the parish's operating budget for the entire year.

56.     The use of these funds – necessitated by the historic designation of the Subject Property – has required St. Philip Neri to defer maintenance on the building its congregation actually uses for worship and to divert them away from programs in furtherance of St. Philip Neri's religious mission, thereby burdening that mission.

Marion County, Indiana's Regulation of Historic Structures

57.    The Mayor and City-County Council of the City appoint the members of the IHPC pursuant to Section 36-7-11.1-3(a)-(b) of the Indiana Code.

58.    Pursuant to the laws of the State of Indiana, the IHPC may prepare historic preservation plans, and then, by passing a resolution, submit them to the MDC for consideration as part of the comprehensive master plan of the County.

59.    The IHPC is part of Indianapolis' Department of Metropolitan Development ("DMD").

60.    The Director of the DMD has several duties, including to "Provide advice and assistance to the historic preservation commission, as established by IC 36-7-11.1, and the administrator of its staff in coordinating the programs and policies of the department with historic preservation programs and policies, to review the work program of the commission as provided by IC 36-7-11.1-4 and to provide advice in the appointment of the administrator as provided in IC 36-7-11.1-4."

61.    The MDC functions as the board of the DMD, with several of its own related and independent duties.

62.    A Historic Preservation Plan is "prepared by the Indianapolis Historic Preservation Commission (as per IC 36-7-11.1-6) and adopted by the Metropolitan Development Commission (MDC), designating one or more historic areas or structures as having historic or architectural significance.  This historic preservation plan, once adopted by the MDC, shall be considered a part of the county's comprehensive plan."

63.     Once the IHPC adopts a resolution to recommend a preservation plan, the MDC may then pass a resolution to adopt the preservation plan, which has the effect of amending the Marion County comprehensive plan.

64.     Once the MDC adopts an historic preservation plan for an area, Indiana law prevents the MDC from issuing any permits related to any structure within the historic preservation area, such as for alteration or demolition unless the applicant provides a "certificate of appropriateness."

65.     Only the IHPC may issue a "certificate of appropriateness."

66.     The MDC authorizes the IHPC to exercise its powers within any historic district that has been adopted pursuant to Section 36-7-11.1 of the Indiana Code.

<u>The Historic Designation</u>

67.     In early 2024, approximately 10 years after the parish merger and since the Church Building was closed to the public, Father Dufresne scheduled a meeting with the leadership of the "Holy Cross Neighborhood Association" (the "Neighborhood Association") to hear their concerns regarding the future of the church building.  When the parish's religious discernment was completed, he sent a letter to inform the members of the neighborhood association that the Church Building and Rectory would be demolished.  The intention behind the letter was to avoid surprising the neighborhood.

68.     St. Philip Neri sought to demolish the buildings on the Subject Property to eliminate the dangers to the public of the deteriorating building, to avoid spending additional substantial funds on building maintenance of a building that was no longer a Catholic church and other buildings on the property, to remove the religious obligation of St. Philip Neri to ensure that

the church building is never in the future used in a forbidden manner, and to prepare the Subject Property for sale to fund St. Philip Neri's religious mission.

69.     In response, and to prevent demolition, the Neighborhood Association started a petition to designate the Subject Property as a historic landmark.

70.     Indiana Landmarks filed an emergency petition with the IHPC to landmark the Subject Property to prevent demolition.

71.     Indiana Landmarks is a nonprofit organization that describes itself on its website as one that "help[s] people save and revitalize historic places."

72.     Indiana Landmarks was motivated to apply for the historic designation of the Subject Property based on Plaintiffs' plan to demolish the Church Building and Rectory.

73.     The IHPC moved forward with an emergency designation.

74.     Prior to the designation, the IHPC did not visit the interior of the Church Building, meet with the pastor of St. Philip Neri, or engage any experts to review the repair costs for the Church Building or any other structure of the Subject Property.

75.     The IHPC drafted Historic Area Preservation Plan – 44 (the "Preservation Plan"), a part of the Comprehensive Plan for Marion County, Indiana, which would historically designate the Holy Cross School Building, the Church of the Holy Cross Church Building, the Church Rectory, and Kelley Hall.

76.     The Preservation Plan did not include any information related to the collapsed portico or the fact that the structure had been closed to the public for nearly ten years due to its unsafe condition.

77.     The Preservation Plan included as its "Preservation Objectives": "The subject structures on this campus, exterior features of the site and architectural and historic character thereof shall be preserved as a significant resource of Indianapolis and Marion County."

78.     The Preservation Plan included the following "Preservation Criteria":

    a.     "Any development, construction, reconstruction, restoration, or alteration of the subject structure's interior, exterior, or site shall be appropriate to the property's historic and architectural values and significance.

    b.     Any development, construction, reconstruction, restoration, or alteration of the exterior shall be visually compatible and appropriate in function, general design, arrangement, color, texture and materials to the design and character of the historic area.

    c.     The IHPC shall use the *Secretary of the Interior's Standards for the Treatment of Historic Properties: With Guidelines for Preserving, Rehabilitation, Restoring & Reconstructing Historic Buildings* to determine appropriateness when it reviews and makes decisions regarding development, construction, reconstruction, preservation, restoration, alteration, and demolition in the historic area."

79.     On its face, the Preservation Plan thus invokes the color of state law to unlawfully impose IHPC authority over religious features and aspects of this Catholic Church property, including the immovable religious symbols on the exterior of the Church Building.

80.     On the afternoon of March 25, 2024, the IHPC Administrator contacted the Archdiocese Properties' general counsel and informed him that on March 27, 2024, there would

13

be a public meeting of the IHPC with respect to a certain resolution declaring the Subject Property of historic significance.  This was the first notice to the Plaintiffs of such a public meeting.

81.     The IHPC's website includes numerous public notices and meeting minutes of the IHPC.

82.     The Preservation Plan states that the IHPC adopted the Preservation Plan on March 27, 2024.

83.     There is no public notice of a March 27, 2024 meeting, nor are there any minutes of a March 27, 2024 meeting available on the IHPC's website.

84.     Upon information and belief, the failure to include notice of a hearing related to the Preservation Plan or to provide public meeting minutes related to the adoption of the Preservation Plan is a deviation from the IHPC's procedural norms.

85.     Nonetheless, and despite the short notice, Plaintiffs' counsel attended the March 27, 2024 IHPC hearing and objected to the historical designation.

86.     The MDC adopted the Preservation Plan on April 17, 2024 through the adoption of 2024-HP-001.

87.     The statements of IHPC officials, as detailed below, establish that the Preservation Plan recommendation, and its subsequent adoption by the MDC, were based on the officials' interpretations of Roman Catholic Canon law, a desire to substitute their judgments on religious matters for those of the Plaintiffs, and a distortion of and an excessive entanglement of government officials with religious doctrine.

88.     The MDC Minutes of its April 17, 2024 MDC meeting do not include any discussion of or reference to the Preservation Plan or Holy Cross Church.

89.     Upon information and belief, the failure to include notice of a hearing related to the Preservation Plan or to provide public meeting minutes related to MDC's adoption of resolution to amend the Master Plan is a deviation from the MDC's procedural norms.

90.     The MDC's Rules of Procedure require that all petitions be filed at least thirty-five (35) days prior to the initial hearing at which they are to be considered, unless otherwise requested by the petitioner and approved by the Administrator.

91.     Upon information and belief, a petition to adopt the Preservation Plan was not filed at least thirty-five (35) days prior to the initial MDC hearing at which it was to be considered.

92.     The failure to follow its own Rules of Procedure would constitute an act of arbitrariness by a deviation from procedural norms in the handling of the historical designation of the Subject Property.

<u>Plaintiffs Seek Permission to Demolish Two Religiously Significant Buildings</u>

93.     Since the entire purpose of the historical designation was to prevent demolition, it was unlikely that the IHPC would approve any plan for demolition.

94.     Archdiocese Properties nonetheless filed its Petition #2025-COA-351 (HC) to the IHPC on or about August 27, 2025 (the "Demolition Application").

95.     Archdiocese Properties, as Trustee of the Subject Property and on behalf of Plaintiff St. Philip Neri, sought a certificate of appropriateness authorizing the demolition of the Church Building and Holy Cross Rectory in a safe, controlled fashion.

96.     The certificate of appropriateness would allow for the removal of the Church Building (to which the Rectory is physically connected), which has religious significance and which is inappropriate to be repurposed.  The Kelley Hall and School would remain and could be revitalized for other economically feasible purposes.

97.    Plaintiffs further requested removal of the historic designation, adopted in the Preservation Plan, pursuant to Indiana Code § 36-7-11-23.

98.    The IHPC held a hearing on the Demolition Application on October 1, 2025.

99.    The October 1, 2025 IHPC hearing was dominated by efforts by officials and commenters to critique and even to ridicule the religious determinations of Plaintiffs and individuals associated with the Plaintiffs, to substitute their judgments about Roman Catholic religious doctrine for that of the Plaintiffs, and to disrupt and intrude on the religious autonomy of the Plaintiffs.

100.    Multiple governmental officials provided their statements and opinions on what "the Church" is and what Roman Catholicism requires of Plaintiffs, creating a decision making environment for the Demolition Application that was entangled with religious opinions and distorted religious concepts.

101.    The religious statements by the Members at the October 1, 2025 IHPC hearing on the Demolition Application were so pervasive that it was impossible to separate the religious opinions and statements from any secular basis for consideration of the legal criteria meant to guide the IHPC's decision making.

102.    The IHPC's Procedures specify that "[a]pplicants and remonstrators, respectively, are permitted a total of twenty (20) minutes for the presentation of evidence, statements, and arguments at the public hearing of every case before the Commission or Hearing Officer."

103.    Neither side at an IHPC hearing is permitted to cross examine witnesses or object to any testimony.

104.    Plaintiffs' counsel began the hearing by presenting the Demolition Application at the October 1, 2025 IHPC hearing and informed the IHPC of the Church's canonical requirements and that the Church Building would not be sold.

105.    Plaintiffs' counsel informed the IHPC that Plaintiffs' presentation would involve presentations by Father Dufresne and a representative of Arsee Engineering, which had prepared an engineering evaluation and preliminary renovation estimate for the Church Building that had been submitted to the IHPC.

106.    Plaintiffs' counsel also testified that once the Church Building and Rectory had been demolished, the Plaintiffs would sell the remaining two buildings and the land of the Subject Property for redevelopment and revitalization of the area.

107.    Father Jeffrey Dufresne, pastor of St. Philip Neri, also addressed the IHPC.

108.    Father Dufresne informed the IHPC of his ultimate responsibility under Canon law to ensure that any use of the Church Building and Rectory be in accordance with the dignity of a church building in perpetuity, and that after prayerful reflection he determined that demolition of the structures was the appropriate choice.

109.    A member of the public, unaffiliated with Plaintiffs, stood up to speak next.  He stated that he was motivated to speak by hearing other attendees laughing and joking during Father Dufresne's remarks about religious freedom.  This individual spoke for approximately four minutes altogether, using up one-fifth of the time allocated for the Plaintiffs.

110.    Plaintiffs' engineer attempted to speak to the IHPC about the condition of the Church Building and costs for repair, but the Chairman told him that he had only one and half minutes remaining and would have to limit his comments.  He had to end his incomplete presentation due to the twenty-minute time limitation.

111.    The IHPC next heard from objectors at the October 1, 2025 hearing, which uniformly displayed disregard for, and hostility to, Plaintiffs' sincere and deeply held Catholic beliefs.

112.    The first, the chair of the "Holy Cross Land Use Committee," suggested that the Church Building – despite the uncontroverted religious testimony to the contrary – could be repurposed into a performing arts center, with a coffee shop and bookstore.

113.    He also spoke about other Catholic churches that he stated had been reused and invited the IHPC to rely on his lay interpretation of Vatican documents over Father Dufresne's testimony.

114.    A representative of Indiana Landmarks next addressed the IHPC, giving his business address and offering it as, "A great example of a historic church building that has been adaptively reused for other purposes."

115.     The Indiana Landmarks campus is located in a former Methodist Church, a church unrelated to the Roman Catholic Church and its Canon law, and the repurposing of which is subject to entirely separate theological requirements.

116.    The Indiana Landmarks representative attempted to cast doubt on the sincerity of Father Dufresne's interpretation of Roman Catholic Canon law and again invited the IHPC to weigh his layman's competing interpretation, telling the IHPC that, "I fully respect, and I want to make sure this is really clear, I fully respect the values and the belief system of Father Dufresne and the Catholic Church and the decisions that they feel like they need to make. And I guess those would be further reinforced if, as [the chair of the Holy Cross Land Use Committee] just pointed out, that we didn't know of other examples in the Indianapolis Archdiocese that they had allowed for the use of other Catholic churches that closed and/or marketed them for sale."

117.    He then gave two examples of other Catholic churches as support for his argument although neither characterization is supported by the facts.

118.    The first example, St. Michael the Archangel Church, was donated to Historic Madison, Inc. in 1993 and has sat largely unrestored for 30 years.

119.    Historic Madison, Inc. has subsequently sold the St. Michael the Archangel rectory for use as a private home.

120.    The second example, Our Lady of Providence in Brownstown, Indiana, was merged into another parish in 2016 as part of the same Connected in the Spirit planning process that included Holy Cross.  Archbishop Thompson signed an Order relegating Our Lady of Providence to profane but not sordid use in March 2025.  Our Lady of Providence has not been sold or marketed for sale and disposal will be subject to the rules, laws, and limitations of the Roman Catholic Church.

121.    The Indiana Landmarks representative then stated that, "So, I guess I need some convincing as to why that can't work in the case of Holy Cross," before ultimately asserting that Indiana Landmarks was "open to dialogue" with the Archdiocese to determine the use of the Church Building.

122.    The next individual to speak in opposition to the Demolition Application lives more than seven miles away from the Subject Property.  He, too, invited the IHPC to disregard the Plaintiffs' sincerely held beliefs about the disposition of the Church Building, speaking of the "cultural importance of the structure outside of looking at it through a religious lens.  The Church has to be separate from the State, but removing the historical status seems to prioritize the Church's laws over the State's laws.  Yeah, if the Church does not want to keep paying for it, I suggest they

sell it with contingencies on the occupancies and use that take place. As you guys have heard, there are plenty of precedents to do that. . . . All that to say this parish should not perish."

123. Jesse Brown, the City Council member for the district in which the Subject Property next stood to speak in opposition, and the IHPC stopped the timer for him.

124. Councilor Brown discussed his previous letter in support of the historic designation and how he had spoken in favor of the designation, saying that he was there to "double down upon that support."

125. Councilor Brown then expressly invited the IHPC to give his lay understanding of Roman Catholic Canon law preference over that of Father Dufresne and Plaintiff, identifying himself as a "confirmed Catholic" and discussing how other Catholics supported his statements at the prior meeting. Councilor Brown stated: "[B]ut I want to say I deeply disagree that Canon law universally requires these kind of structures to be demolished rather than reused. As they mentioned, there is substantial documentation from the Vatican itself that suggests it's not only permissible but actually desirable to reuse buildings for charitable or cultural purposes."

126. He continued, "It really hurts me that it feels that the Church is creating contention and disagreement here where there should not be any. I believe everyone in this room shares many of the same values. We all value our neighborhoods and the people who live in them. We all love our neighbors. We all want more culture, more reverence, and more fellowship in our society. Though not everyone in this room might call themselves Christians, I can say for myself that these values are at the very core of my Christianity, and it's so deeply disappointing that the Catholic Church is resorting to repeated unilateral actions to attempt to defy the super majority will of the neighbors, families, and community members who love and want to protect the buildings."

127.    He then repeated remarks he said he had made "last spring," stating that "[t]he etymology of the word Church has nothing to do with a building, it has everything to do with the community.  Disregarding the needs of the community and instead treating the building as the most important consideration flies in the face of my understanding of Christianity.   In a neighborhood, as in a democracy, we can never guarantee total unanimity about how to govern, but I would challenge anyone here to find a local issue with so many different community partners all on one side and a single landowner standing alone on the other."

128.    Councilor Brown was speaking as a governmental representative, and not in his personal capacity, as reflected by the IHPC stopping the time accorded to each party for Councilor Brown's remarks.

129.    The MDC's adoption of Resolution 2024-HP-001 created excessive entanglement between government and religion by creating an environment in which Plaintiffs' Demolition Application was subjected to a public hearing in which government officials offered opinions about competing interpretations of Church doctrine and law.

130.    The next speaker in opposition to the Demolition Application also lives more than five miles away from the Subject Property.  He identified himself as a former Historian for the IHPC and a "a proud practicing Catholic," and spoke about a Franciscan Friary that had been demolished in the 1980's along with the "the nickels and dimes that my grandparents and great-grandparents saved to build these Church buildings and the friary and how these second, second-generation Irish in Holy Cross got their own parish. And they, they're the ones that built the Church. It took their money, they paid the architect, they paid the contractors to build something lasting, for not just themselves, but for all eternity."  He discussed other repurposing of Catholic

institutions of which he was aware, including a church now used as a brewery and bar, which he referred to as a "glorious use."

131.    The next speaker in opposition lives a little over three miles from the Subject Property.  She began her remarks by stating that her connection to the Subject Property "is that I served as the last school librarian for Holy Cross Central School before it closed."  She stated that she had never been inside the Church Building "because it was closed by the time I joined in 2021, it's a landmark.  I live on the east side, I drive by all the time, and I always check to make sure that it's still there.  It's interesting, Father Dufresne brought up dignity, and the speaker before me also brought up the poor immigrants who gave their money to build the Church.  In my opinion, dignity for those folks and the people who have done really hard work, important work on this property would be to give these buildings a new life."

132.    Prior to voting on the Demolition Application, IHPC members made public comments.

133.    Commissioner Krystin Wiggs raised the possibility of further sanctioning Plaintiffs for not renovating or selling the Subject Property, noting that, "it seems nothing has really changed as far as movement from the church's side. The demolition by neglect is something that is concerning to me, to just let it keep going and going and no agreement. So in residential situations, when something falls into disrepair and neglect, the department's business and neighborhood, sorry, BNS, will cite the owner; your roof is falling down, it's a danger to everyone. Does that happen? Is it an option here?"

134.    Commissioner Annie Lear took the opportunity to advise Father Dufresne and Plaintiffs on the nature of the Catholic Church. She stated, "[I]n some ways, I honestly don't know where to begin.  So I will try to be respectful and brief. And I have no different feeling than I did

a year and a half ago when this came to us. That just the sadness of the missed opportunity for the church that you're speaking about to serve the community that it's at the heart of it.  It's not that I don't respect the cost and all of those things that are involved, but like the church is the people, these people. So, I think what I find so frustrating is the lack of desire--and I understand the argument around Canon law and all of that. But what I don't understand is the desire to work with the people in the neighborhood, and Indiana Landmarks and those people to have a use of it that would serve your faith. I mean, I guess that's what I don't really understand. And so it's just I feel like it's just a missed opportunity here, and just the stalemate of oh, no, we're gonna [sic] hold the line on this because we don't want to do this when there are many examples tonight where it has been done and been done wonderfully. It's reflected well on your faith and it's served the community.  So that's what I guess I don't really understand here is just the missed opportunity. And I guess back to Father Dufresne's statement, this isn't a matter of whether you can be objective, whether you're Catholic or not.  That has nothing to do with this. And we, as a historic preservation organization, shouldn't be shamed or put down because we are prioritizing the history of a building when we all stand on the backs of everyone that has come before us."

135.    Commissioner Lear was acting under color of state law at all times that she opined on who is or should be considered to be part of "the church."

136.    Commissioner Lear's comments constituted an intrusion on and interference with Plaintiffs' religious autonomy and an entanglement of the state with religious doctrine by substituting her understanding of the nature of the Roman Catholic Church and Roman Catholic doctrine for that of the Plaintiffs.

137.    Commissioner Anjenette Sivilich read from a pre-prepared statement on a laptop in front of her, addressing Plaintiffs and quoting Pope Francis.  She stated: "I am fully for the freedom

of religion, and I was trying to understand your point of view as a Catholic, and how that fits in as the world Catholic view. Current Canon law, please bear with me since I need to read this[1], was enacted nearly 42 years ago.  Thoughts, ideals, and goals can easily change in the span of time, especially in the modern age. One of the secondary goals of preservation is to preserve world resources and to be a good steward to our planet.  The preservation of a structure, even if it is in fair to poor condition, has a significant amount of embodied energy.  This energy that would otherwise need to be used to demolish an existing structure, source and ship new products, and build a new structures, this is a key point when trying to reduce carbon emissions, pollution, and ever-expanding landfills.  In his June 2015 [sic] Pope Francis stated that the Encyclical is for everyone, not just Catholics.  In this message it stated that Pope Francis has added the voice of the global Catholic Church to the calls for agreement on the legally binding framework to decarbonize our societies as a matter of urgency.  The science on climate change is already clear.  Pope Francis has now clearly outlined the moral and spiritual arguments for taking action. Pope Francis makes clear that everything is interconnected;  we are custodians of this planet and we have a clear moral obligation to ensure that everyone has access to its abundant resources, and that we hand it to future generations in a condition that is compatible with life.  In November of 2018, the Pontifical Council for Culture, along with the Italian Episcopal Conference and Pontifical Gregorian University, held an international conference that discussed for two days the issue at hand in this case. The resultant document guidelines decommissioning an Ecclesial reuse of churches is quite clear regarding the Vatican's position a profane use of alienated, immovable goods.  The document states that the Church authorities and community are to dialogue and work with the local

---

[1] At this point the Commissioner turned to a laptop that she had open on the table in front her.

community and civic authorities to find a new use for that asset, rather than destroying a valuable cultural heritage site."

138.    Commissioner Sivilich was acting under color of state law at all times that she characterized the pronouncements of the Vatican and other Catholic institutions and opined on the requirements of the deconsecration of Catholic churches.

139.    Commissioner Sivilich's statements constituted an intrusion on and interference with Plaintiffs' religious autonomy and an entanglement of the state with religious doctrine by substituting her interpretations of Roman Catholic Canon law, her view of the authority of the Pope and the Pope's position with regard to aspects of Roman Catholic Canon law, her views of the authority and interpretation of Pontifical Councils, and Roman Catholic religious doctrine, for that of the Plaintiffs.

140.    Commissioner Keller asked Plaintiffs' counsel why there was deferred maintenance of the Church Building for many years, and in response to Plaintiffs' counsel's answer that the structure had not been deemed historic until 2024 and that the Church had been considering many offers and ideas for the last ten years, Commissioner Keller responded that, "[Y]ou're trying to have your cake and eat it too.  You're saying that this is a sacred space that has inherent dignity as a place of worship. But then you've fallen it to – has [sic] allowed it to fall into a state of disrepair that is not -- that is beneath its dignity.  So, which is it?  Is it a dignified space that needs to be saved from a sordid use, or is it a structure that needs to be demolished because it's fallen into such disrepair? I don't think you can have it both ways."

141.    Commissioner Keller was acting under color of state law at all times that he was suggesting Plaintiffs had unintentionally waived its right to determine the religiously appropriate course of action with respect to the Church Building.

142.    Commissioner Keller also read from prepared statements and questions on a tablet positioned in front of him.  He asked Plaintiffs, "[Y]ou cite repeatedly the risk of this falling–this property falling into sordid use.  There's no real definition of sordid use, at least that I've been able to find. Can you, the fact that you believe it's such an imminent risk, can you cite an example in the Archdiocese catchment of a property that has fallen into sordid use?"

143.    When Plaintiffs' counsel began to cite the previously-mentioned St. Joseph's church, Commissioner Keller interrupted him to say: "The Brewery? Somebody better notify the Trappists."

144.    The audience in attendance laughed and cheered at Commissioner Keller's statements.  When Father Dufresne rose to speak, he had to wait for the audience's laughter and applause to die down.  The IHPC chair did not admonish the audience.

145.    Father Dufresne responded to the question, in part, saying "[T]he fact that we're discussing the Catholic Church's criteria for sordid use or profane use is an illustration of exactly what our concerns are about these proceedings, that they've wandered into Church matters and out of the realm of the IHPC's mandate."

146.    Commissioner Keller argued that, "We are not trying to define what is sordid. We are asking you to define, or, one of your representatives, to give us a single example, a single citation or sordid use, and  if it's such an imminent risk you should be able to rattle a few off. You cited one that seems like maybe it could be, but probably not, because, you know, what's the sordid behavior?"

147.    Plaintiffs' counsel replied that the Vatican defines a for-profit business as a potentially sordid use.

148.    Commissioner Keller continued to argue this point, responding "Potentially . . . but what's the potential?  I mean, where does it move from potential to actual?"

149.    Plaintiffs' counsel's continued attempts to respond – all of which answers concern deep and significant matters of Catholic theology not appropriate for lay discussion at public hearings under color of state law – did not satisfy Commissioner Keller.  He stated, "[A]gain, you'll forgive us if the term dignity is given a little less weight because, again, letting it fall into the state of disrepair is -- some people, and I'm not a Canon lawyer either, but I do believe some people would, recognize that as desecration of a sacred space.  So you want us to respect your religious freedom to honor the risk of a sordid use, but are unable to cite any sordid uses.  It just doesn't feel like the risk that you're trying to make it out to be, and so you know I just don't think we can consider the things you've presented, because they just don't seem to be as you've presented them."

150.    Commissioner Keller's comments constituted an intrusion on and interference with Plaintiffs' religious autonomy and an entanglement of the state with religious doctrine by substituting his understanding of the nature of Roman Catholic Canon law and Roman Catholic religious doctrine for that of the Plaintiffs.

151.    Commissioner Mike Bivens, an attorney, spoke next.  Commissioner Bivens referenced Commissioner Keller's question before admonishing Plaintiffs for "looking for a fight," saying, "Could you give us an example of what could happen?  I don't think he was trying to judge the validity of the Church's definition of sordid, as I might have understood Father Dufresne to say or suggest. We're trying to help. I mean, I'm proud to be part of this body that's bent over backwards trying to help so many congregations over the decades solve the problems that they have in protected districts. And it seems like the Applicant has come in here looking for a fight

27

where none exists. We're not a political body. We have guidelines. We're not going to opine on Constitutional law or Canonical law, we're going to look at our guidelines. What's our mandate? Make an educated decision based on the evidence and wish everybody well. That's what we do. So instead of coming in here looking for confrontation, or maybe we just -- tell us what you need to help get you where you want to be and we can find a way. We have resources, we can direct you."

152.    Commissioner Bivens continued, stating, "I don't think anyone wants to make social commentary or some kind of ideological debate on why a church wants to demolish its structures. We have our guidelines. If you tell us that it's against your religion to let anybody else use your church for any reason, we'll have to take that as the truth. But that is not a fight that we fight. We can only look at our rules. I think you understand what I'm saying."

153.    Commissioner Bivens next asked staff about Plaintiffs' claims that the effort to designate the Subject Property was rushed.

154.    Staff of the IHPC confirmed that the IHPC enacted the "emergency designation," in reaction to Plaintiffs' stated intent to demolish the Church Building and Rectory and for the express purpose of preventing them from doing so.

155.    Commissioner Bivens next asked Plaintiffs for the specific Canon law that prevented the reuse, and when Father Dufresne responded that it was the fear of the building falling into sordid use, Commissioner Bivens responded that he would assume that there wasn't one that wasn't "obvious to us."

156.    Commissioner Bivens' comments constituted an intrusion on and interference with Plaintiffs' religious autonomy and an entanglement of the state with religious doctrine by

questioning that sought to parse and second-guess Plaintiffs' understanding of the nature of Roman Catholic Canon law and Roman Catholic religious doctrine.

157.    Commissioner Disa Watson-Summer next addressed Plaintiffs, stating "[B]oth of you addressed freedoms that you felt having Historic Preservation coverage stopped the Archdiocese from having the freedom to do what it wanted to do with its property.  My question is: When Holy Cross was closed, did the priest at Holy Cross tell his parishioners, you have a choice of where, which church you're going to attend?  Or did he tell them 'you will be going to go to St. Philip Neri, and that's where all of your records will be sent to?'"

158.    Plaintiffs' counsel responded that there is an appeals process in the event of a closure of a Church and as to parishioners, "I don't believe anybody tells anyone where they have to go to church."

159.    Commissioner Watson-Summers responded, "[Y]ou, the Archdiocese, can't say we are being – our freedom is being taken to do what we want with our property, when you closed the church, you took away those parishioners. Because as good Catholics, you're going to follow what your priest says;  that's what you're taught, you listen to your priest.  And so when he said, you're going to St. Philip Neri, that's where all your information was, that's where they went. They weren't told that even though the church is closing, you can select what parish you're going to start visiting and worshipping at, and you let us know, and we send your records there.  And that's a freedom that if that wasn't handled that way, and that they didn't have, what you're stating is as one of your objections for the historical preservation coverage that your freedom, the Archdiocese's freedom, is being stifled because they can't just tear down a piece of property because they want to.  So, I mean, this is something to look at.  I know you have been given a directive, as well as the pastor has, as to what the Archdiocese wants, but maybe and if you have

a discussion point, that's something you can bring up. Not only do you have a freedom, all the parishioners have a freedom, all of those parishioners from Holy Cross have a freedom, and you're -- the destruction of a church, you've already closed it, which took away their connection to the church they had chose [sic] to attend either through family history or just deciding, I want to be a part of this church. When you closed that, you took that. So now, the next step, you want to take the building and tear it down. So that wipes away, and you bring in Canon law. Could you tell me which Canon law you were speaking of that says, you know, a sacred place? But you also talked about when you walk in that place that you can feel the prayers that have been prayed over years and years. What better place would that be to reestablish another entity? Could you imagine? Whether it be apartments, the apartments on the church that was on Meridian, and I think St. Clair, that was turned into apartments. To be in a building where all of these prayers had been prayed over and over. Whether make it into, you know, a youth center. Can you imagine the feel of that? And how you're actually putting something positive into the community, in the atmosphere."

160.    Commissioner Watson-Summers' questions, hours into the hearing on the Demolition Application, had nothing to do with any historic preservation or land-use criteria, but solely matters of Church practice and governance.

161.    Commission Watson-Summers' comments and questions constituted an intrusion into and interference with Plaintiffs' religious autonomy and an entanglement of the state with religious doctrine by substituting her non-Catholic understanding of the nature of Roman Catholic Canon law, Roman Catholic religious doctrine, and her personal views of what a "good Catholic" should do for those of the Plaintiffs.

162.    Commissioner William A. Browne, Jr. was the final Commissioner to speak. He asked a question based on the falsehood regarding Our Lady of Providence stated by the

representative of Indiana Landmarks, asking, "But can you cite why this is different than the other church that was sold during this time since the designation and it was allowed to be sold? What's unique about this situation that makes this such that it needs to be handled differently?"

163.    Plaintiffs' counsel responded by stating that although the building had been relegated by the Archdiocese, it had not been sold and any decisions as to the sale would be made by the pastor of that parish, just as Father Dufresne had made the decisions in this case.

164.    Commissioner Browne responded by derogating the "opinion of one individual" over the matter, meaning Father Dufresne, who alone had the constitutional competence, and referring to the IHPC as a body that may have a differing opinion, before continuing that "It doesn't seem, you know, realistic to have an entire neighborhood who is supporting this facility, wanting to take care of it in a very proper way, being respectful of it, and yet one individual is not giving a good enough reason other than we just want to demolish it because that's what I want to do.  And that really isn't going to hold a lot of water with me personally. It's not going to likely hold much water with this Commission."

165.    Commissioner Browne's comments reflect a substitution of his personal views of how decisions of the Roman Catholic Church should be made and an intrusion into and interference with the religious doctrines and religious autonomy of the Roman Catholic Church.

166.    On October 1, 2025, the IHPC unanimously voted to deny the Demolition Application.

167.    When Commissioner Browne announced that the motion to deny the Demolition Application had passed unanimously there were cheers and whooping from the crowd. Commissioner Browne did not admonish the crowd or ask them to be quiet.

168.    The IHPC's Findings of Fact and Reasons for Denial (the "Denial") included:

a. "The denial does not deprive the owner of all reasonable use and benefit of the property. The applicant states that they have no use for the property and desire to sell it, what [sic] they want it [sic] to sell the property without the church building on it. Denial does not preclude the applicant from not using the property, from selling the property, or for another user to re-use the buildings, similar to many other former Catholic churches."

b. "Approval would have a substantial negative effect on the historic integrity of the area. The church is the centerpiece of the district, and the namesake of the surrounding neighborhood. Demolition of the buildings erases the history and architecture of the site, for the neighborhood and the city."

169. The IHPC weighed competing testimony about interpretations of Roman Catholic Canon law and decided that certain interpretations were more credible than others.

170. The IHPC's reasoning in the Denial mirrors statements made by objectors at the October 1, 2025 hearing, which uniformly displayed disregard for, and hostility to, Plaintiffs' sincere and deeply held Catholic beliefs.

<u>The Defendants Have Violated the Plaintiffs' Rights</u>

171. The MDC's adoption of 2024-HP-001 forecloses any ability of Archdiocese Properties to alter, renovate, demolish, or otherwise modify the Subject Property without the approval of the IHPC or else be subjected to civil penalties, including assessment fees.

172. The MDC's adoption of 2024-HP-001 requires the Plaintiffs to maintain a church that is closed, deconsecrated, and no longer usable as a church at considerable expense and prevents them from selling the property due to the concern that the church building could in the future be put to a forbidden use in violation of Roman Catholic Canon law.

173.    The IHPC's denial of the Demolition Application forecloses any ability of Archdiocese Properties to demolish the Church Building and Rectory.

174.    The IHPC has demonstrated an entrenched position that they will not approve any demolition of the Church Building and Rectory.

175.    The MDC's landmarking of the Subject Property and the IHPC's denial of the Demolition Application have subjected Plaintiffs to delay, uncertainty and additional expense related to the Subject Property.

176.    By prohibiting Plaintiffs from demolishing the Church Building and Rectory, the Defendants have burdened Plaintiffs' religious exercise.

177.    Defendants have no compelling or legitimate governmental interest that requires this burden on the Plaintiffs' religious exercise.

178.    Defendants' actions are not the least restrictive means of advancing any governmental interest.

179.    The Defendants' interpretation and evaluation of Roman Catholic Canon law, both by relying on statements of government officials regarding religious doctrine and statements by other persons, in the denial of the Demolition Application constituted impermissible government intrusion into and interference with religious doctrine, interference with Plaintiffs' religious autonomy, and discrimination against the Plaintiffs.

180.    In designating the Subject Property as a historic landmark, the Defendants made an individualized determination regarding the use of the Subject Property.

181.    The Defendants were executing a policy of preventing alteration to the Subject Property that resulted in a violation of the Plaintiffs' rights.

182.    The Defendants' actions caused the Plaintiffs to suffer injury, including additional costs associated with the Demolition Application and necessary maintenance to the Subject Property.

183.    The harm to the Plaintiffs caused by the Defendants' historic landmark designation of the Subject Property, which prevents the Church from stewarding its resources in accordance with its religious mission, is immediate and severe.

184.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful actions.

185.    The denial of the Demolition Application was a final decision and was not reviewable by any other administrative body.

186.    The demolition activity related to the proposed demolition of the Church Building and Rectory would affect interstate commerce.

187.    The demolition's effect on interstate commerce would result from, among other things, the Plaintiffs' transfer of funds to those it engages to perform the demolition; the engagement of a demolition company to demolish the Church Building and Rectory; the marketing of the remainder of the Subject Property after the demolition; the use of interstate highways for the transportation of persons to demolish the Church Building and Rectory as well as to remove debris from the demolition; the use of interstate communication related to an effort at the demolition; the use of interstate communication related to the marketing and sale of the remainder of the Subject Property after demolition; and other activities related to the demolition and sale.

188.    The Defendants' actions described above all took place under color of state law.

189.    For the above reasons, the historic landmark designation of the Subject Property should be enjoined in order to remove the burden such designation places upon the Plaintiffs' religious exercise.

## COUNT I

**United States Constitution, First Amendment**
**42 U.S.C. § 1983**
**Free Exercise of Religion**
*against all Defendants*

190.    Plaintiffs incorporate Paragraphs 1 through 189 above as if set forth fully herein.

191.    Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by imposing and implementing land use regulations in a manner that, on their face and as applied to the Plaintiffs, burden Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest; by intruding into matters of Plaintiffs' religious doctrine and religious decision making and interfering with their religious autonomy; and by discriminating against Plaintiffs on the basis of religion.

192.    Defendants' actions as aforesaid have caused and continue to cause significant harm to Plaintiffs, including but not limited to deprivation of their First Amendment rights, interference with their religious exercise and autonomy, and monetary damages.

193.    Defendants are liable for the harm caused to Plaintiffs.  Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, costs, and attorney's fees as provided under 42 U.S.C. § 1988.

## COUNT II

**United States Constitution, First Amendment**

**42 U.S.C. § 1983**
**Establishment Clause**
*against all Defendants*

194.    Plaintiffs incorporate paragraphs 1 through 193 above as if fully set forth herein.

195.    The IHPC, through its adoption of the resolution recommending the  Preservation Plan, the MDC through its adoption of the Preservation Plan in enacting 2024-HP-001, and the IHPC through its denial of the certificate of appropriateness, on their face and as applied to the Plaintiffs, violated the Establishment Clause of the United States Constitution.

196.    These actions, as evidenced by the statements of government officials, intruded on the religious decision making of the Plaintiffs, interfered with Plaintiffs' religious autonomy, entangled the government in religious issues, and substituted the religious judgments of government actors for those of religious officials, in violation of the Establishment Clause.

197.    Defendants are liable for the harm caused to Plaintiffs.  Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, costs, and attorney's fees as provided under 42 U.S.C. § 1988.

**COUNT III**
**United States Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**
**Equal Protection Clause**
*Against all Defendants*

198.    Plaintiffs incorporate paragraphs 1 through 197 above as if fully set forth herein.

199.    The IHPC, through its adoption of the resolution recommending the Preservation Plan, the MDC through its adoption of the Preservation Plan in enacting 2024-HP-001, and the IHPC through its denial of the certificate of appropriateness, on their face and as applied to the Plaintiffs, violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

200. These actions, as evidenced by the statements of government officials, discriminated against Plaintiffs on the basis of religion and burdened the fundamental right of religious liberty, both on their face and as applied to Plaintiffs, in violation of the Equal Protection Clause.

201. Defendants are liable for the harm caused to Plaintiffs.

202. Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, costs, and attorney's fees as provided under 42 U.S.C. § 1988.

## COUNT IV

### Religious Land Use and Institutionalized Persons Act of 2000
### "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)
### *against all Defendants*

203. Plaintiffs incorporate paragraphs 1 through 202 above as if fully set forth herein.

204. Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that, on their face and as applied to the Plaintiffs, places a substantial burden on the Plaintiffs' religious exercise.

205. Defendants have failed to demonstrate that these regulations employ the least restrictive means of achieving a compelling governmental interest.

206. Defendants' actions have caused and continue to cause significant harm to Plaintiffs, including but not limited to interference with their religious exercise, constitutional violations, and monetary damages.

207. Defendants are liable for the harm caused to Plaintiffs. Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, costs, and attorney's fees as provided under 42 U.S.C. § 2000cc-2.

## COUNT V
### Religious Land Use and Institutionalized Persons Act of 2000
### "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)
*against all Defendants*

208.    Plaintiffs incorporate paragraphs 1 through 207 above as if set forth fully herein.

209.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that, on their face and as applied to the Plaintiffs, discriminates against them on the basis of religion and religious denomination, both on their face and as applied to Plaintiffs.

210.    Defendants' actions as aforesaid, have caused significant damage to Plaintiffs.

211.    Defendants are liable for the harm caused to Plaintiffs.  Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, costs, and attorney's fees as provided under 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2.

## COUNT VI
### Indiana Religious Freedom Restoration Act
### Ind. Code § 34-13-9, *et seq.*
*against all Defendants*

212.    Plaintiffs incorporate paragraphs 1 through 211 above as if fully set forth herein.

213.    By enacting 2024-HP-001 and denying the certificate of appropriateness, Defendants have imposed and implemented land use regulations in a manner that, on their face and as applied to the Plaintiffs, substantially burdened and continue to substantially burden Plaintiffs' exercise of religion, in violation of Indiana Code §§ 34-13-9-1, *et seq.*

214.    Defendants have failed to demonstrate that these regulations are essential to further a compelling governmental interest and represent the least restrictive means of furthering that interest.

### COUNT VII

**Indiana Constitution**
**Art. I §§ 2, 3, and 4**
*against all Defendants*

215.    Plaintiffs incorporate paragraphs 1 through 214 above as if fully set forth herein.

216.    The IHPC, through its adoption of the resolution recommending the  Preservation Plan, the MDC through its adoption of the Preservation Plan in enacting 2024-HP-001, and IHPC through its denial of the certificate of appropriateness, have imposed and implemented land use regulations in a manner that, on their face and as applied to the Plaintiffs, violated Sections 2, 3, and 4 of the Indiana Constitution.

217.    These actions materially burdened, and continue to materially burden, the right of Plaintiffs and their parishioners to worship according to the dictates of their consciences, the right freely to exercise religious opinions and rights of conscience, and their right to be free from governmental preference for particular religions and religious ideas.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs, ST. PHILIP NERI CATHOLIC CHURCH, INDIANAPOLIS, INC. and ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS PROPERTIES, INC., respectfully request that this Court grant the following relief:

A.    A declaration that MDC's adoption of 2024-HP-001 is unconstitutional and illegal in violation of the Free Exercise Clause of the First Amendment, the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth

Amendment,    RLUIPA's    Substantial    Burden    provision,    RLUIPA's
Nondiscrimination provision, the Indiana Religious Freedom Restoration Act, and
the Indiana Constitution Article I, sections 2, 3, and 4;

B.    A declaration that Historic Area Preservation Plan – 44, as adopted, is
unconstitutional and illegal in violation of the Free Exercise Clause of the First
Amendment, the Establishment Clause of the First Amendment, the Equal
Protection Clause of the Fourteenth Amendment, RLUIPA's Substantial Burden
provision, RLUIPA's Nondiscrimination provision, the Indiana Religious Freedom
Restoration Act, and the Indiana Constitution Article I, sections 2, 3, and 4;

C.    A declaration that the IHPC's denial of Petition #2025-COA-351 (HC) is
unconstitutional and illegal in violation of the Free Exercise Clause of the First
Amendment, the Establishment Clause of the First Amendment, the Equal
Protection Clause of the Fourteenth Amendment, RLUIPA's Substantial Burden
provision, RLUIPA's Nondiscrimination provision, the Indiana Religious Freedom
Restoration Act, and the Indiana Constitution Article 1, sections 2, 3, and 4;

D.    An order reversing the MDC's adoption of 2024-HP-001;

E.    An order directing the IHPC to grant Petition #2025-COA-351 (HC);

F.    Preliminary and permanent orders enjoining Defendants, their officers, employees,
agents, successors, and all others acting in concert with them from applying the
land use regulations described above in a manner that violates the Free Exercise
Clause of the First Amendment, the Establishment Clause of the First Amendment,
the Equal Protection Clause of the Fourteenth Amendment, RLUIPA, 42 U.S.C. §
1982, and state law, or undertaking any and all action in furtherance of such acts;

G.     An award of compensatory damages against Defendants in favor of Plaintiffs as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, RLUIPA and the Indiana Religious Freedom Restoration Act caused by Defendants' laws and by Defendants' actions in relation to the adoption of 2024-HP-001 and the denial of Petition #2025-COA-351 (HC);

H.     An award to Plaintiffs pursuant to 42 U.S.C. § 1983, RLUIPA and the Indiana Religious Freedom Restoration Act of full costs and attorneys' fees arising out of Defendants' actions, land use decisions and out of this litigation; and

I.     Such other and further relief as this Court may deem just and appropriate.


Dated: January 26, 2026                                        Respectfully submitted,


                                                               /s/ Michael A. Swift
                                                               Michael A. Swift (17779-49)
                                                               **MAGINOT, MOORE & BECK LLP**
                                                               150 West Market St., Suite 800
                                                               Indianapolis, IN 46204
                                                               Tel: (317) 644-8323
                                                               maswift@maginot.com



                                                               Roman P. Storzer *(admitted pro hac vice)*
                                                               Eric W. Treene *(admitted pro hac vice)*
                                                               **STORZER & ASSOCIATES, P.C.**
                                                               1025 Connecticut Ave NW, Suite 1000
                                                               Washington, D.C. 20036
                                                               Tel: (202) 857-9766
                                                               Facsimile: (202) 315-3996
                                                               storzer@storzerlaw.com
                                                               treene@storzerlaw.com


                                                               *Attorneys for Plaintiffs*