UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| ST. PHILIP NERI CATHOLIC CHURCH, INDIANAPOLIS, INC., and ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS PROPERTIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INDIANAPOLIS HISTORIC PRESERVATION COMMISSION, and THE METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:25-cv-02616-MPB-TAB |

**BRIEF OF AMICUS CURIAE RELIGIOUS FREEDOM INSTITUTE'S ISLAM AND RELIGIOUS FREEDOM ACTION TEAM IN SUPPORT OF PLAINTIFFS**

Nicholas Reaves *(pro hac vice pending)*
YALE FREE EXERCISE CLINIC
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
(202) 349-7212
Nicholas.reaves@yale.edu

Gordon D. Todd *(pro hac vice pending)*
Rachel Layne *(pro hac vice pending)*
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
(202) 736-8000
gtodd@sidley.com

Hector Pagan *(pro hac vice pending)*
SIDLEY AUSTIN LLP
60 State Street
Boston, MA 02109

Philip H. DeVoe *(pro hac vice pending)*
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

I.    PROTECTING RELIGIOUS LAND-USE RIGHTS IS ESSENTIAL FOR A
BROAD AND DIVERSE RANGE OF FAITH TRADITIONS ..................................... 2

    A.    Many Faith Traditions Manage Sacred Property According to Doctrinal
Requirements. ................................................................................................................ 2

    B.    Because of Their Unique and Unfamiliar Practices, Minority Faiths are
Highly Vulnerable Within Discretionary Land-Use Systems. ................................. 4

II.    DEFENDANTS VIOLATED THE CHURCH AUTONOMY DOCTRINE BY
OVERRIDING PLAINTIFFS' RELIGIOUS DETERMINATION .............................. 6

    A.    The First Amendment Protects the Right to Make Religious
Determinations Without Government Interference. ................................................. 6

    B.    The Commission Second-Guessed and Ultimately Overruled Plaintiffs'
Theological Judgment. ................................................................................................. 8

III.    DEFENDANTS' LAND-USE REGULATIONS SUBSTANTIALLY
BURDENED PLAINTIFFS' RELIGIOUS EXERCISE ................................................ 9

    A.    Plaintiffs' Adherence to Canon Law Is Religious Exercise Protected by
RLUIPA. ..................................................................................................................... 11

    B.    By Preventing Plaintiffs from Following Canon Law, Defendants Have
Imposed a Substantial Burden on the Plaintiffs' Religious Exercise. ................... 12

CONCLUSION............................................................................................................... 15

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ................................................................................................. 9

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
    605 U.S. 238 (2025) .................................................................................................. 7

*CLUB v. City of Chicago,*
    342 F.3d 752 (7th Cir. 2003) ................................................................................... 10

*Friends to Restore St. Mary's, LLC v. Church of Saint Mary, Melrose,*
    934 N.W.2d 130 (Minn. App. 2019)........................................................................ 8

*Garrick v. Moody Bible Inst.,*
    95 F.4th 1104 (7th Cir. 2024)................................................................................... 6

*Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter,*
    456 F.3d 978 (9th Cir. 2006) .................................................................................... 5

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ................................................................................................. 11

*Islamic Ctr. of Miss., Inc. v. City of Starkville,*
    840 F.2d 293 (5th Cir. 1988) .................................................................................... 5

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N.
    Am.,*
    344 U.S. 94 (1952) ............................................................................................ 1, 6, 7

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) .................................................................................... 6

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.,*
    157 F.4th 627 (5th Cir. 2025).................................................................................... 7

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian
    Church,*
    393 U.S. 440 (1969) ............................................................................................... 7, 8

*Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) .................................................................................................. 9

*Union Gospel Mission of Yakima Wash. v. Brown,*
    162 F.4th 1190 (9th Cir. 2026)................................................................................. 7

*United States v. Cnty. of Culpeper,*
245 F. Supp. 3d 758 (W.D. Va. 2017)..................................................................... 10

*Westminster Presbyterian Church v. City of Peoria,*
No. 08-CV-1205, 2010 WL 11646775 (C.D. Ill. Aug. 27, 2010)............................. 12

*World Outreach Conference Ctr. v. City of Chicago,*
591 F.3d 531 (7th Cir. 2009) ........................................................................... 11, 12

**Statutes**

42 U.S.C. § 2000cc(a)(1).......................................................................................... 10

42 U.S.C. § 2000cc-5(7)(A) ...................................................................................... 11

**Legislative History**

146 Cong. Rec. 16,698 (2000)........................................................................ 5, 10, 14

*Protecting Religious Freedom After* Boerne v. Flores *(Part II): Hearing
Before the Subcomm. on the Const. of the H. Comm. on the
Judiciary,* 105th Cong. 41 (1999)...................................................................... 13, 14

*Religious Liberty Protection Act of 1998: Hearing on H.R. 4019 Before
the Subcomm. on the Const. of the H. Comm. on the Judiciary,*
105th Cong. 202 (1998) ..................................................................................... 13, 14

**Scholarly Authorities**

Ashira Ostrow, *Judicial Review of Local Land Use Decisions: Lessons
from RLUIPA*, 31 Harv. J. L. & Pub. Pol'y 717 (2008) ........................................... 4

Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C.
Davis L. Rev. 755 (1999) ...................................................................................... 14

Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest,
and Under-Enforced*, 39 Fordham Urb. L.J. 1021 (2012)...................................... 4

John Rhodes, *An American Tradition: The Religious Persecution of
Native Americans*, 52 Mont. L. Rev. 13 (1991).................................................... 4

Shilpa Sharma & Shireesh Deshpande, *Architectural Strategies Used
in Hindu Temples to Emphasize Sacredness*, 34 J. Architectural &
Plan. Rsch. 309 (2017)........................................................................................ 4

**Other Authorities**

Babylonian Talmud, Megillah.................................................................................. 3

Christopher Longhurst, *Theology of a Mosque: The Sacred Inspiring Form, Function and Design in Islamic Architecture*, Lonaard Mag., Mar. 2012.................................................................................................................. 4

Maimonides, Mishneh Torah ................................................................................. 3

Michael MacKay, *Sacred Space: Exploring the Birthplace of Mormonism* (2016)................................................................................................... 4

Mishnah, Megillah..................................................................................................... 3

N. Am. Islamic Tr., *About Waqf*, https://perma.cc/V7HT-HG6B (last visited Apr. 1, 2026) ................................................................................................ 3

Sultan Shahin, *Why Can't Mosques Be Relocated Or Deconsecrated And Sold In Certain Situations As Churches Are?* (June 4, 2022), https://perma.cc/P4FQ-BHUF............................................................................... 3

Shulchan Arukh, Orach Chayim............................................................................. 3

Shulchan Arukh, Yoreh De'ah ................................................................................ 3

Vine Deloria Jr., *God Is Red: A Native View of Religion* (3d ed. 2003) ...................... 4

## INTEREST OF AMICUS CURIAE

The Islam and Religious Freedom Action Team (IRF) of the Religious Freedom Institute amplifies Muslim voices on religious freedom, seeks a deeper understanding of support for religious freedom inside Islamic teachings, and aims to protect Muslims' religious freedom. The IRF engages in research, education, and advocacy on core issues including equal citizenship for diverse faiths and freedom from coercion. The IRF fosters inclusion of Muslims in religious freedom work. The IRF files this amicus brief to provide the Court with additional context critical to resolving the legal arguments raised by the parties and to highlight why protecting religious land-use decisions from potentially hostile local governments is especially important given the unwarranted hostility and suspicion many minority faith communities face when seeking to expand into a new community.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

In disputes over a church's doctrines and missions—including those regarding "the disposition or use of property"—the church alone decides. *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 120–21 (1952). Yet the Defendants turned that rule upside down, arrogating to themselves the power to interpret Catholic doctrine. According to them, because other churches purportedly have been willing to sell their buildings to secular developers, Plaintiffs should be, too—no matter their own sincere religious determination to the contrary.

---

[1] This brief has been prepared in part by a clinic operated by Yale Law School, but it does not purport to present the School's institutional views, if any. No party's counsel authored the brief in whole or in part and no party, party's counsel, or other person contributed money intended to fund preparing or submitting this brief.

1

While this case involves a Catholic church, its resolution has implications for people of numerous religious traditions, many of which recognize the fundamental importance of choices regarding how sacred buildings are treated. Indeed, judicial protection of religious land-use is especially important for religious minorities whose interests may be insufficiently represented in the political process.

Defendants seek to put Plaintiffs to the choice of either incurring massive expenses for indefinite upkeep of a deteriorating building—a cost they cannot afford—or violating their faith by selling the building and allowing a religiously significant space to fall into sordid use. Neither the Constitution nor RLUIPA tolerates the imposition of that burden. This Court should grant Plaintiffs' requested relief and reaffirm the authority of all religious institutions to manage their property in accordance with their faith.

## I. PROTECTING RELIGIOUS LAND-USE RIGHTS IS ESSENTIAL FOR A BROAD AND DIVERSE RANGE OF FAITH TRADITIONS

Religious exercise is often viewed as something tied to a group of people, but for many faith traditions, buildings, objects, and land are just as important. For these communities, strict limitations on the sale and secular use of formerly sacred property are cornerstones of religious practice. But the highly discretionary nature of land-use regulations means that minority religions are particularly at risk of abuse in zoning decisions.

### A. Many Faith Traditions Manage Sacred Property According to Doctrinal Requirements.

The management and disposition of sacred property is a core religious expression across a wide range of faith traditions. For Muslims, "the place of worship

2

is intrinsic to Islam's self-identity." Christopher Longhurst, *Theology of a Mosque: The Sacred Inspiring Form, Function and Design in Islamic Architecture*, Lonaard Mag., Mar. 2012, at 4. Mosques are considered *waqf*—permanent endowments. *See* N. Am. Islamic Tr., *About Waqf*, https://perma.cc/V7HT-HG6B (last visited Apr. 1, 2026). As a result, Islamic juristic authorities have forbidden the secular use of deconsecrated mosques. *See* Sultan Shahin, *Why Can't Mosques Be Relocated Or Deconsecrated And Sold In Certain Situations As Churches Are?* (June 4, 2022), https://perma.cc/P4FQ-BHUF.

Jewish synagogues have religious significance, requiring adherence to a strict deconsecration process. Deconsecrated synagogues may not be used for unworthy purposes, such as a tannery or bathhouse. *See* Mishnah, Megillah 3:2. If the congregation chooses to sell the synagogue, the generated proceeds are holy and must be used for a sacred purpose, such as purchasing Torahs—the first five books of the Bible. *See* Shulchan Arukh, Orach Chayim 153:2. When deconsecrating a synagogue, holy objects like a Torah must be stored or buried respectfully. *See* Babylonian Talmud, Megillah 26b:8. The Jewish faith also treats gravesites as sacred, and this sacred status persists even if the remains are exhumed and the land is no longer used for burials. Shulchan Arukh, Yoreh De'ah 364:1; *see also* Maimonides, Mishneh Torah, Mourning 14:17, 14:19.

Other minority faiths also maintain doctrinal ties to specific physical spaces. For example, Native American religions consider their land itself to be sacred. Vine Deloria, *God Is Red: A Native View of Religion* 146 (3d ed. 2003). In the Church of

3

Jesus Christ of Latter-day Saints, several salvific ordinances can "only be performed in [Mormon] temple[s]." Michael MacKay, *Sacred Space: Exploring the Birthplace of Mormonism* 3 (2016). And in Hinduism, a temple is "the house of a god, and therefore every step of its construction is sanctified." Shilpa Sharma & Shireesh Deshpande, *Architectural Strategies Used in Hindu Temples to Emphasize Sacredness*, 34 J. Architectural & Plan. Rsch. 309, 310 (2017).

### B. Because of Their Unique and Unfamiliar Practices, Minority Faiths are Highly Vulnerable Within Discretionary Land-Use Systems.

Minority faiths are particularly at risk because government officials historically struggle to understand religious practices that fall outside familiar Western paradigms. *See* John Rhodes, *An American Tradition: The Religious Persecution of Native Americans*, 52 Mont. L. Rev. 13, 16–17 (1991). The prevailing land-use regulation system is "highly discretionary" and heavily relies on subjective assessments. Ashira Ostrow, *Judicial Review of Local Land Use Decisions: Lessons from RLUIPA*, 31 Harv. J. L. & Pub. Pol'y 717, 725–26 (2008). Without objective guidelines, this standardless licensing leaves First Amendment rights uniquely vulnerable to arbitrary or discriminatory outcomes. *See* Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1022 (2012).

Congress has recognized that minority faiths are particularly vulnerable under discretionary land-use systems. When enacting RLUIPA, the legislative record explicitly noted that "[c]hurches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against" by zoning codes. 146 Cong. Rec.

4

16,698 (2000) (joint statement of Sens. Hatch and Kennedy) [hereinafter *Joint Statement*].

Minority faiths have frequently called courts to curb the abuses of zoning power against minority faiths. In *Islamic Center of Mississippi, Inc. v. City of Starkville*, a city required a zoning exception to operate places of worship. 840 F.2d 293, 294 (5th Cir. 1988). The city allowed 25 Christian churches to operate but repeatedly denied the creation of a mosque, citing "traffic control" problems. *Id.* at 296–97, 302. In ruling for Plaintiffs-Appellants, including the Islamic Center, the Fifth Circuit specifically noted the contrast between the city's treatment of Christian churches and the Islamic Center, and that the Islamic Center was the *only* religious group ever denied an exception. *See id.* at 294.

In *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, a Sikh society was initially denied a residential permit due to noise complaints. 456 F.3d 978, 982 (9th Cir. 2006). To appease the county, the group bought an isolated agricultural property and agreed to reduce their noise pollution. *Id.* at 990–91. The county again rejected the application, despite the Planning Division's finding that the group's noise pollution would be minimal. *See id.* Applying RLUIPA, the court held that the county's inconsistent standards greatly "lessened the prospect of Guru Nanak being able to construct a temple," which amounted to a substantial burden. *Id.* at 992.

The fact that this case involves a Catholic church only underscores the danger to people of all faiths. If the adherents of one of America's largest faith traditions

5

struggle to obtain adequate protection for their religious land-use, then smaller faith communities are at even greater risk.

## II. DEFENDANTS VIOLATED THE CHURCH AUTONOMY DOCTRINE BY OVERRIDING PLAINTIFFS' RELIGIOUS DETERMINATION

The church autonomy doctrine guarantees Plaintiffs the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116. Here, Plaintiffs' decision about how to manage their own church property is an internal religious determination, and Defendants violated the church autonomy doctrine when they second-guessed and overruled that determination.

### A. The First Amendment Protects the Right to Make Religious Determinations Without Government Interference.

The Free Exercise and Establishment Clauses converge to protect the right of religious organizations to "shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013). This principle of church autonomy "protects against government interference in 'faith and doctrine' and 'matters of church government.'" *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1111 (7th Cir. 2024) (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020)), *reh'g denied*, No. 21-2683, 2024 WL 1892433 (7th Cir. Apr. 30, 2024).

The First Amendment's "special protection for the autonomy of religious institutions" reflects the "understanding that church and state are 'two rightful authorities,' each supreme in its own sphere." *Cath. Charities Bureau, Inc. v. Wis.*

6

*Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 256–57 (2025) (Thomas, J., concurring) (citation modified). Against the backdrop of centuries of government interference with religious affairs, the Founders sought to guarantee the "independence of religious institutions to govern their own affairs free from government intrusion." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 634 (5th Cir. 2025), *cert denied*, No. 25-807, 2026 WL 490870 (Feb. 23, 2026).

The Supreme Court's earliest church autonomy case involved a "dispute over the right to use church property." *Union Gospel Mission of Yakima Wash. v. Brown*, 162 F.4th 1190, 1201–02 (9th Cir. 2026) (citing *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 726 (1872)). Ever since, the Court has recognized that the doctrine prevents the government from seeking to override religious determinations regarding property. For example, in *Kedroff*, the Court recognized that when a "property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls." 344 U.S. at 120–21. And in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, the Court made clear that the government must "decide church property disputes without resolving underlying controversies over religious doctrine." 393 U.S. 440, 449 (1969). Those principles naturally protect the sort of religious decision at issue here, and minority faiths that manage sacred property. *See Friends to Restore St. Mary's, LLC v. Church of Saint Mary, Melrose*, 934 N.W.2d 130, 140 (Minn. App. 2019) (recognizing that "the decision to remove features of religious significance and demolish the church building is an internal decision that affects the faith and mission of the church"). A Muslim

7

community, for example, must be empowered to restrict the use of funds following the sale of an unused mosque toward the construction of a new mosque, *see* Shahin, *supra* (quoting Ibn Abidin Shami, Raddul Muhtar, 4/359), just as Canon law binds the church here.

As the Supreme Court has explained, "the interpretation of particular church doctrines and the importance of those doctrines to the religion" are "matters at the very core of a religion." *Hull Church*, 393 U.S. at 450. Such theological questions are thus for the church alone to resolve—without government interference.

## B. The Commission Second-Guessed and Ultimately Overruled Plaintiffs' Theological Judgment.

Over the course of the October 1 hearing, multiple Commissioners made statements questioning the reasonableness or validity of Plaintiffs' sincere beliefs. One Commissioner expressed frustration with the "missed opportunity" to allow the church to "serve the community," because "the church is the people," notwithstanding "the argument around Canon law and all of that." Am. Compl. ¶ 134. This statement impermissibly dismissed the Catholic Church's internal governance structure and instead substituted the Commissioner's own understanding of "the people" who constituted "the church." *Id.* Another Commissioner read a statement that cited Pope Francis and attempted to evaluate Plaintiffs' consistency with "the world Catholic view," while also suggesting "[c]urrent Canon law" was outdated because it was "enacted nearly 42 years ago." *Id.* ¶ 137. Still another Commissioner mocked the notion that a brewery could constitute a "sordid use" under Catholic doctrine, resulting in laughter from the audience. *Id.* ¶¶ 142–144. And a fourth Commissioner

8

implied that Plaintiffs should follow the example of another Catholic church that purportedly "was allowed to be sold," an assertion that evidently was supposed to demonstrate that Plaintiffs' application of Catholic doctrine was incorrect. *Id.* ¶ 162.

These attitudes were not confined to the hearing. When the Commission ultimately issued its formal Findings of Fact and Reasons for Denial, it referenced the actions of "many other former Catholic churches" as examples of what Plaintiffs were permitted to do—a clear attempt to suggest that Plaintiffs were misapplying Catholic doctrine. *Id.* ¶ 168. That is precisely what the church autonomy doctrine forbids. And Defendants have stood by these statements.

Fundamentally, whether Plaintiffs "correctly perceived the commands" of Canon law is not a proper subject for the government to adjudicate. *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981). Nor may Plaintiffs be told that their sincere beliefs are "flawed" or "unreasonable." *See id.* at 715; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724–25 (2014). Yet in this case, Defendants overrode Plaintiffs' determination that no proposed secular use of the property was religiously permissible. That denial of religious autonomy contravened the First Amendment.

## III.   DEFENDANTS' LAND-USE REGULATIONS SUBSTANTIALLY BURDENED PLAINTIFFS' RELIGIOUS EXERCISE

In addition to violating the church autonomy doctrine, Defendants' actions also violate RLUIPA, which Congress enacted to ensure that the power to make religious land-use decisions remains first and foremost with religious institutions. RLUIPA forbids the government to impose land-use regulations in a manner that substantially

burdens religious exercise unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of doing so. 42 U.S.C. § 2000cc(a)(1); *see CLUB v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).

As discussed above, RLUIPA is a critical battlement for minority faiths, which are frequent targets of hostile state land-use decision-makers. In enacting RLUIPA, Congress took particular note of prevalent "discrimination against small and unfamiliar denominations," finding "massive evidence" that land controls "frequently violate[]" religious rights, especially those of "new, small, or unfamiliar" houses of worship. *Joint Statement* at 16,698–99. As such, when courts apply RLUIPA robustly, they expand protections for a broader range of faiths, conforming RLUIPA to Congress's design. *See, e.g.*, *United States v. Cnty. of Culpeper,* 245 F. Supp. 3d 758, 769 (W.D. Va. 2017) (finding substantial burden under RLUIPA when a zoning board denied a routine sewage permit for a proposed mosque).

Here, Plaintiffs engaged in religious exercise by managing their church property and resources consistent with Canon law and Defendants' *prohibition* has substantially burdened Plaintiffs' religious exercise. Indeed, RLUIPA's legislative history makes clear that Congress specifically understood that land-use decisions— including the denial of demolition permits—can impose substantial burdens on religious exercise, and it compiled an extensive factual record documenting such burdens.

10

### A. Plaintiffs' Adherence to Canon Law Is Religious Exercise Protected by RLUIPA.

Plaintiffs' fulfillment of their obligation under Canon law to avoid sordid use of a deconsecrated building constitutes religious exercise under RLUIPA, and demolition of the church building is the means by which they seek to discharge that obligation. *See* Am. Compl. ¶ 48. RLUIPA in turn defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). And RLUIPA protects religious exercise even when it is not practiced by all members of a given religion and when a plaintiff has other ways of practicing his faith. *See Holt v. Hobbs*, 574 U.S. 352, 353, 361 (2015).

Consistent with that framework, Plaintiffs have determined that the only acceptable way to fulfill this religious exercise is to demolish the church building. *See* Am. Compl. ¶ 68. But Defendants have thwarted Plaintiffs' ability to fulfill this religious obligation by landmarking the church. By focusing on the demolition, Defendants chase a red herring—what matters is Plaintiffs' chosen expression.

The Seventh Circuit has made this exact distinction in several cases. In *World Outreach Conference Center v. City of Chicago*, a church filed suit under RLUIPA after the city denied its request to demolish a structure on its property in order to build a new "Family Life Center." 591 F.3d 531, 539 (7th Cir. 2009). The court treated the construction of the Family Life Center as the burdened religious exercise, while the demolition was the means of fulfilling that exercise. *See id.*

Likewise, in *Westminster Presbyterian Church v. City of Peoria*, a church filed suit under RLUIPA when the City of Peoria denied its request to demolish a house

11

on its property to expand its religious ministry. *See* No. 08-CV-1205, 2010 WL 11646775, at \*2, \*5 (C.D. Ill. Aug. 27, 2010). The court again treated the ministry expansion as the church's burdened religious exercise, while the demolition was the means that the plaintiff chose to carry it out. *See id.* at \*6.

The same is true here: Plaintiffs' religious exercise is their compliance with the demands of Canon law, while the demolition of their church building is the means— indeed, the only means acceptable to Plaintiffs—of accomplishing that exercise. Without demolition, the parish cannot remain financially viable, and resources will continue to be diverted from core religious functions. By contrast, demolition would allow Plaintiffs to redeploy those resources to support and grow their religious activities.

## B. By Preventing Plaintiffs from Following Canon Law, Defendants Have Imposed a Substantial Burden on the Plaintiffs' Religious Exercise.

Because Plaintiffs' adherence to Canon law is a form of religious exercise, RLUIPA does not allow the government to substantially burden it through land-use regulations. And the legislative history of RLUIPA strongly suggests that a denial of a demolition permit can substantially burden a plaintiff's religious exercise. In the hearings leading up to RLUIPA's enactment, Congress heard testimony describing how the denial of demolition permits imposed substantial burdens on religious exercise. This confirms that denials of demolition permits were among the substantial burdens that Congress had in mind when it was drafting RLUIPA's statutory protections of religious exercise.

12

While considering RLUIPA, Congress heard from Dr. Richard Robb one example of a substantial burden resulting from a denied demolition permit. *Protecting Religious Freedom After* Boerne v. Flores *(Part II): Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. 41 (1998) (statement of Richard Robb) [hereinafter *Robb Statement*]. Dr. Robb recounted how his church had purchased a nearby property to expand its ministry. Over time, however, the property deteriorated to the point where it would cost $150,000 to repair. *Id.* at 41–42. When the church sought permission to demolish the structure, the local Historic District Commission denied the request, forcing the congregation to spend thousands of dollars on maintenance—money that could otherwise have been spent on ministry and community outreach. *See id.* at 42.

At another hearing, Reverend Elenora Giddings Ivory described how the City of Berkeley used landmarking laws to prevent a church from demolishing an unusable structure on its property. *Religious Liberty Protection Act of 1998: Hearing on H.R. 4019 Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. 202, 206 (1998) (statement of Rev. Elenora Giddings Ivory) [hereinafter *Ivory Statement*]. The church was likewise forced to retain an unusable building that would cost one million dollars to restore. *See id.*

Lastly, the work of Professor Douglas Laycock—who played an "indispensable role" in the drafting process of RLUIPA, *Joint Statement* at 16,702—expressly addresses the kind of difficulties faced by churches like St. Philip Neri. In one article cited by the lead sponsors of RLUIPA, *id.* at 16,699, Laycock explained that "long-

13

established mainstream churches are the most frequent victims" of landmarking laws because "[t]hey are the ones with older central city churches that have grown obsolete, too expensive to maintain, and too large . . . for congregations that have greatly changed over time"—St. Philip Neri's situation to a tee. Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. Davis L. Rev. 755, 763 (1999); *see* Am. Compl. ¶¶ 30, 34, 36(a)–(b), 41–45.

RLUIPA's legislative record makes clear that Congress understood that land-use regulations, including the denial of demolition permits, can impose substantial burdens on religious exercise. Because Plaintiffs' predicament mirrors the very examples that Congress relied upon when enacting RLUIPA, Defendants' denial of a demolition permit falls squarely within the category of substantial burdens that RLUIPA was designed to address.

If anything, the burdens imposed on St. Philip Neri are *even more* severe than those that Congress considered when compiling its legislative record. Whereas Dr. Robb testified to $150,000 in costs and Reverend Ivory testified to $1 million in costs, Plaintiffs estimate that repairing their church building would cost between $7.5 and $8.5 million. *Robb Statement* at 42; *Ivory Statement* at 206; Am. Compl. ¶ 43.

Not only are the financial costs significantly weightier for Plaintiffs than for Dr. Robb and Reverend Ivory, but so too is the imposed moral dilemma. Although the congregations in the hearings were forced to expend resources that could otherwise have been directed toward their ministries, they were not compelled to forego their

14

religious obedience. Nevertheless, Congress treated these accounts as evidence that land-use regulations can impose substantial burdens on religious exercise.

By contrast, here, Plaintiffs have a sincere religious conviction that demolishing their church building is the only acceptable way to prevent its falling into sordid use. Am. Compl. ¶¶ 48–49, 108. The Commission's historic designation not only forces Plaintiffs to divert resources from other aspects of their ministry, but it also directly interferes with their ability to comply with their obligations under Canon law. And as discussed above, the decision whether and how to dispose of out-of-use church property is a core religious expression for all manner of religious traditions.

Thus, the present case falls squarely within the scope of RLUIPA's protections and in several ways involves even *greater* burdens than those that Congress contemplated while compiling RLUIPA's legislative record.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Respectfully submitted,

Gordon D. Todd *(pro hac vice pending)*
Rachel Layne *(pro hac vice pending)*
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
(202) 736-8000
gtodd@sidley.com

Philip H. DeVoe *(pro hac vice pending)*
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Hector Pagan *(pro hac vice pending)*
SIDLEY AUSTIN LLP
60 State Street
Boston, MA 02109

Nicholas Reaves *(pro hac vice pending)*
YALE FREE EXERCISE CLINIC
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
(202) 349-7212
nicholas.reaves@yale.edu

*Counsel for Amicus Curiae*

16

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document(s) with the

Court using CM/ECF system, thereby delivering by electronic means to all counsel

of record.

/s/ Gordon D. Todd
Gordon D. Todd
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005

17