**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

ST. PHILIP NERI CATHOLIC CHURCH,
INDIANAPOLIS, INC., and ROMAN
CATHOLIC ARCHDIOCESE OF
INDIANAPOLIS PROPERTIES, INC.,

                    *Plaintiffs,*

      v.

INDIANAPOLIS HISTORIC PRESERVATION
COMMISSION, and THE METROPOLITAN
DEVELOPMENT COMMISSION OF MARION
COUNTY,

                    *Defendants.*

Case No. 1:25-cv-2616-MPB-TAB

---

**BRIEF OF REV. PATRICK E. REIDY, C.S.C.,**
**AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

John A. Meiser (IN Bar No. 36736-71)
Meredith H. Kessler (IN Bar No. 38531-71)
LINDSAY AND MATT MOROUN
  RELIGIOUS LIBERTY CLINIC
Notre Dame Law School
1338 Biolchini Hall
Notre Dame, IN 46556
Telephone: (574) 631-8722
mhollan4@nd.edu

*Counsel for* Amicus Curiae

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

INTEREST OF *AMICUS CURIAE*................................................................................ 1

ARGUMENT ................................................................................................................ 1

    I.   Diocesan authorities are entrusted with the religious obligation to safeguard deconsecrated churches like Holy Cross....................................................... 2

    II.  The Commission intruded upon St. Philip Neri's religious autonomy by preventing demolition of the deconsecrated church ........................................ 5

        A.  The government has no role in deciding how churches like St. Philip Neri carry out their theological obligations.............................................. 6

        B.  Parish authorities will hold religious obligations to steward Holy Cross Church require so long as the building stands ..................................... 8

            1.  Keeping the property would require parish leaders to exercise religious oversight of it and would frustrate their pastoral decision to consolidate parishes ....................................................................... 8

            2.  Alienating the property would also require continued religious oversight— and fails to guarantee that it will be protected from sordid uses ..................... 9

        C.  Denial of permission to demolish Holy Cross Church unconstitutionally invades parish authorities' determination of how to religiously safeguard this property ................................................................................ 12

CONCLUSION .......................................................................................................... 15

CERTIFICATE OF SERVICE .................................................................................... 17

i

**TABLE OF AUTHORITIES**

**Cases**

*Bagko Dev. Co. v. Damitz*, 640 N.E.2d 67 (Ind. Ct. App. 1994)..................................................... 10

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)............................................................ 15

*Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) ..................................... 7

*Drenter v. Druitz*, 883 N.E.2d 1194 (Ind. Ct. App. 2008)............................................................... 10

*First Covenant Church of Seattle v. City of Seattle*, 840 P.2d 174 (Wash. 1992) ...........................15

*Friends to Restore St. Mary's, LLC v. Church of Saint Mary, Melrose*,
    934 N.W.2d 130 (Minn. Ct. App. 2019)................................................................................. 14

*Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012)........................................................................... 7

*Hilo Bay Marina, LLC v. State*, 575 P.3d 568 (Haw. 2025)............................................................11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012)...................................................................................... 6, 12, 13, 14

*In re Cathedral of Immaculate Parish Charitable Trust Appeal*, 328 A.3d 1206 (Vt. 2024) .......14

*Katz v. Goldman*, 168 N.E. 763 (Ohio Ct. App. 1929)..................................................................... 11

*Katz v. Singerman*, 127 So. 2d 515 (La. 1961) ............................................................................... 11

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
    344 U.S. 94 (1952)................................................................................................................ 6, 7

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ........................................................................ 2, 6

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) ............................. *passim*

*Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013) ..... 7, 12

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
    426 U.S. 696 (1976)........................................................................................................ 6, 7, 14

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
    41 F.4th 931 (7th Cir. 2022) ................................................................................................ 7

*Steiner v. Windrow Ests. Home Owners Ass'n*, 713 S.E.2d 518 (N.C. Ct. App. 2011)................ 10

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981)................................................. 15

*Union Gospel Mission of Yakima Washington v. Brown*, 162 F.4th 1190 (9th Cir. 2026)............ 7

*Village of West Dundee v. First United Methodist Church of West Dundee*,
74 N.E.3d 144 (Ill. App. Ct. 2017) .......................................................................... 14

*Watson v. Jones*, 80 U.S. 727 (1872) ................................................................... 6, 7, 12

**Other Authorities**

*Administrative Policies Regarding Property*, Diocese of Fairbanks, bit.ly/4dFo5IO .................... 4

*Archbishop Thompson Issues Decree Regarding Former Church Building*, The Criterion:
Archdiocese of Indianapolis (Dec. 9, 2022), bit.ly/3PuWAYD ................................... 4

*Archbishop Thompson Issues Decree Regarding Former Church Building*, The Criterion:
Archdiocese of Indianapolis (Mar. 14, 2025), bit.ly/3Q4BO29 ................................. 4

*Catechism of the Catholic Church* (2d ed. 2019) .......................................................... 2

Code of Canon Law (Eng. trans. 1983) ...............................................................*passim*

*FAQ on Selling Church Properties*, Archdiocese of Boston, bit.ly/3PuYgRV ............................ 4

*Issues Relating to Religious Liberty Protection, and Focusing on the Constitutionality of a
Religious Protection Measure: Hearing before the S. Comm. On the Judiciary*,
106th Cong. 130 (1999) ...................................................................................... 14

Nicole Stelle Garnett & Patrick E. Reidy, C.S.C., *Religious Covenants*,
74 Fla. L. Rev. 821 (2022) ....................................................................... 3, 4, 10, 11

Patrick E. Reidy, C.S.C., *Churching NIMBYs: Creating Affordable Housing on Church Property*,
133 Yale L.J. 1254 (2024) ......................................................................... 9, 15

*Procedural Guide for Sale of Parish Property*, Diocese of Portland, bit.ly/4bJIU39 ................... 4

Rev. Joseph W. Tobin, *Decree*, Archdiocese of Indianapolis (May 21, 2014), bit.ly/41q455H.... 9

Rev. William Saunders, 5 *Disposing of Blessed Objects*, Cath. Educ. Res. Ctr. (2003),
bit.ly/4t5njJC.................................................................................................... 5

Richard W. Garnett, *A Hands–Off Approach to Religious Doctrine: What Are We Talking
About?*, 84 Notre Dame L. Rev. 837 (2009)................................................................. 6

USCCB, 50 *Newsletter from the Committee on Divine Worship* (April 2014) ............................. 5

USCCB, *Built of Living Stones: Art, Architecture, and Worship* (2000) ........................................ 3

**INTEREST OF *AMICUS CURIAE*[1]**

Rev. Patrick E. Reidy, C.S.C., is an Associate Professor of Law at Notre Dame Law School. He also serves as a Faculty Director for the Church Properties Initiative within the Fitzgerald Institute for Real Estate, and as an ordained Roman Catholic Priest with the Congregation of Holy Cross. He teaches and writes in the areas of property law, land use, and religion. In his research, *amicus* explores the intersection of property law and religion, including religious use restrictions and adaptive reuse of church property. Two principal inquiries guide his research: (1) how legal institutions comprehend religion when evaluating property claims, owners, and instruments; and (2) how property doctrines and devices enable, or inhibit, religious practice. While contributing to private law theory, *amicus* also seeks to address practical questions faced by faith communities in their ownership of real and personal property.

**ARGUMENT**

The Indianapolis Historic Preservation Commission's actions prevent St. Philip Neri parish from safeguarding sacred property as its faith dictates. Seeking to protect a once-consecrated church building from prohibited "sordid" uses as canon law requires, parish authorities decided to demolish the building. But the Commission has now foreclosed the very option those authorities determined was theologically appropriate, leaving the parish to sell the building (without guarantee that it will satisfy its religious obligation) or maintain it (at the cost of its religious mission).

Before denying the demolition permit, several commissioners publicly—and unabashedly—explained their reasons for doing so. One invoked Pope Francis's stance on climate change and opined that her own reading of a Vatican document encouraged adaptation, rather than destruction, of church buildings. Am. Compl. ¶ 137. Another demanded that parish authorities point to a "real definition" of "sordid" use and expressed skepticism that there was an "imminent risk" that the property be used that way. *Id.* ¶¶ 140–49. And another mused that instead of

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

depriving the community of its own "freedom," parish authorities should use the building for "something positive in[] the community, in the atmosphere" and allow the "feel[ing]" of "prayer" to animate it. *Id.* ¶ 159. In short, the Commission was unpersuaded by parish authorities' own religious "opinion" on the matter. *Id.* ¶ 164.

The First Amendment does not tolerate this blatant intrusion into the parish's religious determinations. Government officials may not substitute their own judgment or second-guess the decisions of religious leaders on matters of faith and doctrine. *Korte v. Sebelius*, 735 F.3d 654, 677–78 (7th Cir. 2013). The parish authorities here discerned that destroying their building was the best way to ensure that it could never be used for purposes inconsistent with its sacred dedication. Canon law entrusts that decision to the care of local Church authorities, and the First Amendment prohibits the government from interfering with it. The landmark designation and denial of a demolition permit should be invalidated.

## I. Diocesan authorities are entrusted with the religious obligation to safeguard deconsecrated churches like Holy Cross.

In the Catholic tradition, church buildings are not merely real property: They are sacred embodiments of the Church's sacramental life. And as such, the maintenance and disposition of Catholic churches like Holy Cross are deeply religious matters entrusted under Catholic canon law to local Church authorities.

To Catholics, church buildings are living places of God that demand special protection. Even to an outside observer, the sanctity of a church like Holy Cross is inescapable. Indeed, Catholic churches are designed specifically as an expression of and testament to the faith and teachings they embody. For example, the Catechism of the Catholic Church directs that a church should "signify and make visible the Church living in th[at] place, the dwelling of God with men and reconciled and united in Christ." *Catechism of the Catholic Church* 305, § 1180 (2d ed. 2019). Religious meaning is incorporated into the very structure of the building. Indeed, the United States Conference of Catholic Bishops provides an architectural guide for erecting and renovating church buildings, which instructs that these houses of worship must be "expressive of the presence of God

2

and suited for the celebration of the sacrifice of Christ." USCCB, *Built of Living Stones: Art, Architecture, and Worship* 8 (2000). Here, for example, Holy Cross church featured "religious architectural details reflecting its Roman Catholic faith" that were "explicitly and deliberatively designed to communicate and identify the structure to all as a Roman Catholic Church" and "to praise God." Am. Compl. ¶ 28; *see id.* ¶ 29 (describing the pointed arch stained-glass windows, ornamented bell tower, and front façade with crosses, and etchings).

Of course, these structures do not simply *look* religious; for the believers who build them, churches *are* inherently religious as long as they stand. This is especially so once they have been consecrated—or set apart for divine worship. Ritual consecration elevates each Catholic church as a sacred building designated for divine worship. *See* Code of Canon Law, Canon 1205, 1214 (Eng. transl. 1983). Once a church is consecrated, canon law requires local Church authorities to "take care" that "such cleanliness and beauty are preserved as befit a house of God" and to ensure "that whatever is inappropriate to the holiness of the place is excluded." Canon 1220, § 1. These obligations are eternal. They do not cease when a church building is no longer used for active worship, or even once it is deconsecrated and formally relieved of its sacred designation. Indeed, Catholic teaching requires that "special care" be taken even "when it becomes necessary to raze an old church." USCCB, *Built of Living Stones: Art, Architecture, and Worship* 45 (2000).

When a church is deconsecrated, but not destroyed, canon law continues to demand that Church authorities substantially safeguard the building. Because the building was itself "dedicated by solemn rite," deconsecration involves "more than removal of sacred objects." Nicole Stelle Garnett & Patrick E. Reidy, C.S.C., *Religious Covenants*, 74 Fla. L. Rev. 821, 835 (2022) (citing Canons 1217–1219). And the act of deconsecration does not relieve Church leaders from religious obligations with respect to the building. Where churches "cannot be used in any way for divine worship," diocesan bishops may "relegate" them—in the language of Catholic theology—to "profane [(i.e., secular)] but not sordid use." Canon 1222, § 1. Canon law obligates those authorities who "relegate" property that has been used as a house of worship to ensure that "the

good of souls suffers no detriment thereby," creating an expectation that once-consecrated church buildings are never put to "sordid" use.  Canon 1222.

What constitutes a prohibited sordid use is a particular religious determination entrusted to a particular bishop responsible for a particular church.  *See* Garnett & Reidy, *Religious Covenants*, *supra*, at 836.  Local Church authorities must likewise decide how to use or dispose of their property in a manner that protects church buildings from being used for sordid purposes.  Different diocesan bishops, of course, approach such matters of religious discretion differently.  Individual bishops have offered their own guidance defining sordid uses, each seeking to safeguard church buildings that have been used for Catholic worship against future uses that would be inappropriate, immoral, or offensive to Catholics.[2]  As this discretion suggests, canon law does not prescribe a singular way to satisfy its theological requirement.  In one case, for example, the Archbishop of Indianapolis directed certain parishes—based on their religious needs, the condition of the building, and financial considerations—to "dispose of" a church building that had been relegated "to profane but not sordid use."  *Archbishop Thompson Issues Decree Regarding Former Church Building*, The Criterion: Archdiocese of Indianapolis (Mar. 14, 2025), bit.ly/3Q4BO29 (last visited Apr. 8, 2026).  In another, he decreed that two parishes "utilize [a former] church building (not excluding disposition) in a manner that is in accord with Catholic faith and morals, and with the building's dignity as a former place of Divine worship."  *Archbishop Thompson Issues Decree Regarding Former Church Building*, The Criterion: Archdiocese of Indianapolis (Dec. 9, 2022), bit.ly/3PuWAYD (last visited Apr. 8, 2026).  Where the canonical obligation is understood to exist

---

[2] *See, e.g.*, *FAQ on Selling Church Properties*, Archdiocese of Boston, bit.ly/3PuYgRV (last visited Apr. 8, 2026) (profane but not sordid use means "secular use, but one that is not unbecoming, immoral, or offensive to Catholics"); *Administrative Policies Regarding Property*, Diocese of Fairbanks, bit.ly/4dFo5IO (last visited Apr. 8, 2026) (sordid uses are those that are "offensive to the Catholic faithful or detrimental to the good of souls," including use as a church or "other house of religious worship," "an abortion clinic," or offices that "advocate[] abortion or euthanasia" or perform "embryonic stem cell research"); *Procedural Guide for Sale of Parish Property*, Diocese of Portland, bit.ly/4bJIU39 (last visited Apr. 8, 2026) (prohibiting future uses relating to "counseling regarding or performance of abortions," the "sale or distribution of pornographic materials," and "erotic displays or activities").

in perpetuity, bishops are required to safeguard relegated church buildings as long as they stand. Unless Church authorities can ensure that the property will forever be used in ways that are not sordid, the religious duty to protect the building from such sordid future uses can be fully discharged only by demolishing it. *Cf.* Canon 1212, 1222 § 1 (a church is deconsecrated when it is "destroyed in large part" or "turned over *permanently* to profane [but not sordid] use." (emphasis added)). Demolition, then, satisfies this canonical obligation and relieves Church authorities of the religious need to continuously monitor a property's use.

Catholic practices for deconsecrated church buildings are consistent with the faith's treatment of other sacred property. Canon law requires "reverent[]" treatment of sacred objects and forbids "profane or inappropriate use" of such objects, "even if they are owned by private persons." Canon 1171. And, as with church buildings, sometimes destroying the sacred object best fulfills the religious duty to safeguard it from prohibited uses. For example, the USCCB explains that when an altar "can no longer be kept for sacred use, the first and best option may well be to bury it in blessed ground or to destroy it in some manner and bury the remains." USCCB, 50 *NewsLetter from the Committee on Divine Worship* (April 2014). Similarly, the proper disposition of some blessed objects—such as chalices, vestments, altar clothes, and rosaries—"is to burn or to bury them." Rev. William Saunders, *Disposing of Blessed Objects*, Cath. Educ. Res. Ctr. (2003), bit.ly/4t5njJC. This disposition makes sense given Catholic theology, which teaches "that what has been dedicated to God should be returned to God." *Id.* In short, Catholics may decide to destroy sacred property as an act of faithful stewardship.

## II.    The Commission intruded upon St. Philip Neri's religious autonomy by preventing demolition of the deconsecrated church.

In this case, parish authorities have made the difficult decision to demolish the Holy Cross church building in order to fulfill their canonical obligations to safeguard the use and disposition of deconsecrated property. That decision cannot be characterized as anything other than religious. The First Amendment squarely prohibits civil authorities from interfering with decisions like these and demands that this Court reject the Commission's interference with ecclesiastical obligations.

A.    **The government has no role in deciding how churches like St. Philip Neri carry out their theological obligations.**

The Supreme Court has long made clear that the First Amendment guarantees the right of churches "to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012)). The First Amendment gives "special solicitude" to religious organizations' right to govern their internal affairs and "shape [their] own faith and mission." *Hosanna-Tabor*, 565 U.S. at 188–89. Civil authorities have "no say over matters of religious governance." *Korte*, 735 F.3d at 678. Rather, when civil authorities confront questions of "faith[] or ecclesiastical rule, custom, or law," they cannot decide those questions themselves or interfere with the decisions of ecclesiastical authorities on them. *Watson v. Jones*, 80 U.S. 679, 727 (1872).

This so-called "church autonomy" protection serves two purposes. First, it prevents the government from becoming "entangled in essentially religious controversies" that might implicate the Establishment Clause. *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976). Second, it protects the fundamental freedom of churches to govern themselves and their religious practices as promised by the Free Exercise Clause. *See id.*; *Our Lady*, 591 U.S. at 746 ("State interference in [matters of faith and doctrine] would obviously violate the free exercise of religion . . . ."). The doctrine thus "mark[s] a boundary between two separate polities, the secular and the religious, and acknowledg[es] the prerogatives of each in its own sphere." *Korte*, 735 F.3d at 677; *see also Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (religious organizations are "independen[t] from secular control or manipulation"); Richard W. Garnett, *A Hands-Off Approach to Religious Doctrine: What Are We Talking About?*, 84 Notre Dame L. Rev. 837, 861 (2009) (church-autonomy doctrine recognizes that civil "authorities lack the power to answer some questions—religious questions—whose resolution is, under an appropriately pluralistic political theory, left to other institutions").

6

Civil authorities must therefore refuse to intrude into matters that implicate fundamentally ecclesiastical decisions. In *Watson v. Jones*, for example, the U.S. Supreme Court refused to wade into a dispute between factions over which group controlled—and owned the property belonging to—a Presbyterian church. 80 U.S. at 717. The Court reasoned that "a broad and sound view of the relations of church and state under our system of laws" required it to accept the decision of the church's authority as final on such matters of faith, discipline, or ecclesiastical governance. *Id.* at 727. Likewise in *Kedroff*, the Court rejected lower courts' efforts to resolve a dispute over rightful control of a cathedral between competing Russian Orthodox Church groups. 344 U.S. at 115. Those efforts, the Court explained, were unconstitutional intrusions in matters of religious governance. *Id.* at 119. These are not isolated examples; both the Supreme Court and the Seventh Circuit have directed civil authorities to refrain from interfering with churches' decisions on a variety of religious matters. *See also, e.g., Milivojevich*, 426 U.S. at 718 (decision to defrock a bishop); *Our Lady*, 591 U.S. at 762 (employment of schoolteachers); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 942–45 (7th Cir. 2022) (contract dispute between religious school and guidance counselor); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 975–85 (7th Cir. 2021) (discipline of ministerial employees).

In short, the law prohibits the government from interfering with religious organizations' "internal management decisions that are essential to [their] central mission." *Our Lady*, 591 U.S. at 746. And it is emphatically clear that these protections extend broadly to sincerely held religious practices, even when they are not compelled by religious doctrine. *See, e.g.*, *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012). Indeed, matters of discretion sit at the core of church autonomy. *See Our Lady*, 591 U.S. at 737. This bedrock principle thus protects all sorts of ecclesiastical decisions, including those regarding the theologically appropriate disposition of sacred buildings. *See generally Union Gospel Mission of Yakima Washington v. Brown*, 162 F.4th 1190, 1203 (9th Cir. 2026); *cf. Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 84–85, 93 (1st Cir. 2013) (deconsecration constitutes protected religious exercise under the federal Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq.).

7

B.     **Parish authorities will hold religious obligations to steward Holy Cross Church require so long as the building stands.**

There can be no doubt that the decision at the heart of this case—how parish authorities choose to safeguard property that has been used for sacred worship against "sordid" future uses, as canon law requires—is an "internal management decision[]" protected by the First Amendment. *See Our Lady*, 591 U.S. at 746. Here, that decision requires parish authorities to consider their religious obligations with respect to Holy Cross Church should they choose to keep, sell, or demolish their former house of worship. So long as that building stands—whether the parish continues to own the church or transfers it to another group instead—parish leaders here concluded that their religious obligations impose certain perpetual duties. So, they have reached the difficult determination that the only way to actually fulfill their religious obligations—without maintaining religious duties over the property into perpetuity—is to demolish the structure itself. The Commission cannot remove that option and interfere with this fundamentally ecclesiastical decision. By denying the demolition permit, the Commission has left St. Philip Neri with only two choices: keep the structure or sell it. Both would entail central religious commitments from the church—and the choice whether or how to undertake those commitments must be made *by the church*, not the government.

1.     **Keeping the property would require parish leaders to exercise religious oversight of it and would frustrate their pastoral decision to consolidate parishes.**

Take the first option. There can be no real dispute that owning and exercising stewardship over a once-consecrated building will entail fundamental religious commitments by the church. *See supra* Part I.

Even as a congregation, canon law restricts St. Philip Neri's use of the property "to profane but not sordid use." This means that it may not currently use the church for sacred worship as originally intended. To be sure, the parish could attempt to find some other way to use the property in service of its ministry. But the government cannot command that parish leaders make the religious decision to do so by forcing it to keep the property; that command would obviously

8

interfere with the parish's freedom to govern its own religious practices.  *See infra* Part II.A.

Moreover, the decision to deconsecrate the building in the first place reflected shifts in the local

Catholic community.  The Diocese recognized that Holy Cross parish had experienced limited

growth and could not generate sufficient financial support from its remaining congregation, and

thus it did not serve the religious needs of the area to maintain that church.  Am. Compl. ¶ 36; *see*

*also* Canon 1222 (allowing relegation only where "the good of souls suffers no detriment

thereby").  Indeed, it would be substantially burdensome for the diocese to try to maintain the

building even if it had a desired purpose for it.  Because the Commission's landmark designation

demands preservation of the architectural and historical character of the building, keeping the

structure would require the parish to perform extensive repairs that cost around $8 million.  Am.

Compl. ¶¶ 43, 77–78.  But the parish cannot afford these repairs, and the ongoing cost to maintain

the unused building has already forced parish leaders to divert funds away from the congregation's

present religious needs.  *Id.* at ¶¶ 43–44, 56.  *Cf.* Patrick E. Reidy, C.S.C., *Churching NIMBYs:*

*Creating Affordable Housing on Church Property*, 133 Yale L.J. 1254, 1277–81 (2024).

Given these limitations, the Diocese made a pastoral decision to merge the Holy Cross and

St. Philip Neri parishes—a decision that would "allow for stronger evangelization, faith formation,

and vocations programs, as well as effective administration and stewardship of the resources of

the unified parish."  Rev. Joseph W. Tobin, *Decree*, Archdiocese of Indianapolis (May 21, 2014),

bit.ly/41q455H; *see also* Am. Compl. ¶¶ 37–38.   The Commission may not frustrate that

fundamentally religious decision, by forcing St. Philip Neri to simply keep the church and find

something else to do with it.  *See Our Lady*, 591 U.S. at 746 (church autonomy doctrine protects

"decisions that are essential to [a religious] institution's central mission").

**2.  Alienating the property would also require continued religious oversight—and fails to guarantee that it will be protected from sordid uses.**

The option to transfer the deconsecrated church building fares no better.  It is the parish

authorities' belief that any change in ownership does not eliminate their canonical duty to

safeguard the property against sordid uses in the future.  Thus, they cannot simply sell the property

outright and hope that future buyers and occupants will forever respect its request to refrain from certain uses. Indeed, even if the parish could somehow satisfy itself that an initial purchaser had benign intentions for its former house of worship, it would become all the harder to assume good faith by some unknown second or third or fourth buyer down the line.

To mitigate that risk, the parish might consider using legal devices like restrictive covenants to enforce its prohibition on sordid use. But the means of safeguarding the property are themselves burdensome—and far from perfect. To be sure, when alienating or leasing property, some religious organizations impose religiously motivated use restrictions to prevent future uses that they believe to be spiritually or morally illicit. Garnett & Reidy, *Religious Covenants*, *supra*, at 824–25, 854–60. But nonpossessory restrictive covenants face limitations of their own. To start, these restrictions on religious use are often idiosyncratic to faith communities and might be difficult to define. *Id.* at 841. This case illustrates the point. A covenant precluding "sordid" use is hardly self-defining. Indeed, there is no single definition of sordid use even among Catholics. *See supra* Part I. Parish authorities could attempt to write the covenant broadly to cover a wide range of uses that might be difficult to specify or to foresee. But that approach only raises further problems. Courts are often unwilling to enforce restrictive covenants that are drafted in broad or vague terms and tend to resolve any ambiguities in favor of the owner's free use of the property. *See, e.g.*, *Bagko Dev. Co. v. Damitz*, 640 N.E.2d 67, 70–71 (Ind. Ct. App. 1994) (strictly construing broad language in covenants to favor free use of the land); *Drenter v. Druitz*, 883 N.E.2d 1194, 1201 (Ind. Ct. App. 2008) (same); *Steiner v. Windrow Ests. Home Owners Ass'n*, 713 S.E.2d 518, 525–26 (N.C. Ct. App. 2011) (finding covenant void for vagueness because it broadly prohibited an indeterminate range of activities). A host of other considerations might also undermine the administrability and enforceability of use restrictions contained in covenants. For example, courts might refuse to enforce use restrictions that violate public policy, are arbitrary or an unreasonable restraint on alienation, or implicate constitutional rights. *See* Garnett & Reidy, *Religious Covenants*, *supra*, at 854–63.

Regrettably, religiously motivated covenants may be particularly vulnerable to these sorts of challenges. *See generally id.* For example, the same concerns that prevent courts from wading into theological disputes might lead them to find that a religiously grounded covenant is simply too vague to interpret or enforce. *See, e.g.*, *Katz v. Goldman*, 168 N.E. 763, 764–65 (Ohio Ct. App. 1929) (refusing to enforce requirement that property be used as an "Orthodox synagogue" because it would require courts to "become the theologians and the monitors directing and controlling the practices indulged in by the membership"); *Katz v. Singerman*, 127 So. 2d 515, 517, 532–33 (La. 1961) (declining to enforce charter provision requiring "orthodox Polish Jewish ritual" where "every member of the congregation . . . might have a different view as to what this" requires). Indeed, use restrictions "employing theological terminology without delegating interpretive authority" further raise special enforceability concerns. *See* Garnett & Reidy, *Religious Covenants*, *supra*, at 873. These restrictions may "require secular courts to get involved in religious disputes." *See id.* For example, just last year, the Supreme Court of Hawaiʻi held that the state's constitution precluded the government from enforcing a deed restriction requiring land to be used "for Church purposes only." *Hilo Bay Marina, LLC v. State*, 575 P.3d 568, 579 (Haw. 2025). Enforcing the restriction, the court held, would "place[] the State in the role of actively policing what constitutes a 'Church purpose,'" "a role . . . fraught with innumerable ways that the State would be thrust into the business of religion and religious institutions." *Id.* at 592.

To be sure, the law should do better on this score, and courts should not be resistant to enforcing religiously grounded covenants. *See* Garnett & Reidy, *Religious Covenants*, *supra*, at 873 (noting that "non-enforcement of covenants *because they are religious* (or religiously motivated) would likely run afoul of the Free Exercise Clause's mandate of neutrality toward religion"). But, as the law stands, restrictive covenants that raise these sorts of entanglement concerns are an inadequate solution for many faith communities. And it would be a bizarre result indeed if the government could effectively force a church to dispose of its property in a way that civil courts may not even have the authority to enforce. Put simply, St. Philip Neri's leaders cannot

11

turn a blind eye to their religious obligations by selling the property, and they cannot be forced to rely on imperfect—and thus religiously risky—property devices to fulfill those duties.

           **C.**        **Denial of permission to demolish Holy Cross Church unconstitutionally invades parish authorities' determination of how to religiously safeguard this property.**

Added up, St. Philip Neri's leaders have made the difficult pastoral determination that the most certain way to satisfy their obligations with respect to Holy Cross Church is to pursue what the Commission has foreclosed: demolition.  Strange as it may seem to some, demolition is a canonically permissible way to dispose of deconsecrated church buildings.  Canon 1212; *see generally Roman Catholic Bishop of Springfield*, 724 F.3d at 84–85.  And here, it seems that demolition is the *only* way to guarantee that parish authorities fulfill what they understand to be their obligation to safeguard the property from sordid use.  Indeed, this is precisely how the parish here explained its determination that demolition "was the appropriate choice."  Am. Compl. ¶ 108. The parish acknowledged that it could sell the former house of worship "and accept the risk that in the future the building could be put to forbidden use in violation of Roman Catholic laws, rules, regulations and doctrine."  *Id.* ¶ 1.  But, unlike demolition, that would not satisfy the obligation to "permanently" safeguard the property.  *See* Canon 1212.  The parish "sought to demolish the buildings . . . to remove the religious obligation . . . to ensure that the church building is never in the future used in a forbidden manner."  Am. Compl. ¶ 68.  Regardless whether other motivations animated its decision, the parish's determination was fundamentally a religious one.

The Commission cannot supplant that inescapably religious determination.  And it certainly cannot force the parish to choose instead to own or sell the property, requiring religious authorities to forever safeguard the property from sordid uses.

First, it is not up to the Commission to question *whether* such religious obligations exist. Whether a religious obligation exists and how the faithful ought to fulfill it are obviously matters of fundamentally religious concern at the heart of the First Amendment.  *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 186, 189; *Watson*, 80 U.S. at 727.  Second, and relatedly, it is not up to the Commission

to decide how parish authorities should fulfill that religious mission. Yet the commissioners repeatedly invoked Catholic teaching, colored by their own interpretations of its meaning. One questioned whether the decision to demolish could be squared with the obligation to safeguard the building from sordid use. Am. Compl. ¶ 140. Another asked why Holy Cross Church "needs to be handled differently" from another "church that was sold." *Id.* ¶ 162. Still another disagreed with how the Catholic Church delegates authority, explaining that the "opinion of one individual" who "is not giving a good enough reason" for demolition "isn't going to hold a lot of water." *Id.* ¶ 164. As the Supreme Court has long made clear, none of this is for the Commission to decide. For example, in *Our Lady*, the Court rejected the government's attempt to force a religious school to retain an unwanted teacher. 591 U.S. at 738; *see also Hosanna-Tabor*, 565 U.S. at 194. The First Amendment, the Court explained, "does not tolerate" interference with these sorts of religious decisions that implicate "vital religious duties" at "the core of the [church's] mission." *Our Lady*, 591 U.S. at 738, 756. So too here. The Commission may not interfere with the parish's authority to decide which religious obligations to undertake and how to fulfill them.

Allowing the government to inspect or circumscribe decisions like these would undermine the very purpose of the church autonomy doctrine. As the commissioners' testimony here starkly demonstrates, government interference like this leads to impermissible entanglement with religious affairs—deciding, for example, what constitutes a sordid use in Catholic teaching. Second, there can hardly be a more central religious choice than whether to build, how to use, and when to take down a literal house of worship. Intruding into religious decisionmaking like that egregiously deprives faith communities of their freedom to govern themselves and their religious exercise. No one doubts that the choice to consecrate property for sacred worship is the church's religious decision to make. If the government may prevent a faith community from leaving that property in the future—or require its inherently and inescapably sacred buildings to be transferred to others to use as they see fit—the community may hesitate to build or consecrate property essential to its worship in the first place. The result runs headlong into the Supreme Court's warning that civil interference in ecclesiastical matters risks "inhibiting the free development of

13

religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." *Milivojevich*, 426 U.S. at 710; *see also Hosanna-Tabor*, 565 U.S. at 711 (Thomas, J., concurring) (the risk of conforming beliefs and practices out of "[f]ear of potential liability" is "certainly [a] danger[] that the First Amendment was designed to guard against").

Invoking principles of church autonomy, courts have repeatedly protected church authorities' right to make decisions about the disposition of their property—including the choice to demolish sacred property when religiously appropriate.[3]   In Minnesota, for example, parishioners sought to prevent the demolition of a Catholic church.  *Friends to Restore St. Mary's, LLC v. Church of Saint Mary, Melrose*, 934 N.W.2d 130, 132 (Minn. Ct. App. 2019).  The state appellate court held that the First Amendment precluded civil consideration of the claim.  *Id.* at 140.  The local bishop, the court explained, had "made an internal, institutional decision to demolish the church building" "that affects the faith and mission of the church."  *Id.* at 140; *see also In re Cathedral of Immaculate Parish Charitable Trust Appeal*, 328 A.3d 1206, 1208–12 (Vt. 2024) (upholding approval of Catholic church's request to demolish a Cathedral to "'cleanse' the

---

[3] These sorts of decisions are doubly protected under the First Amendment and the federal Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq., which generally prohibits local governments substantially burdening religious exercise in zoning and landmarking.  *See, e.g.*, *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005) (denial of zoning variance substantially burdened church); *Village of West Dundee v. First United Methodist Church of West Dundee*, 74 N.E.3d 144, 150 (Ill. App. Ct. 2017) (refusing to grant demolition permits to churches can substantially burden a church's religious exercise in violation of RLUIPA).  Like the First Amendment, RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).

Congress enacted RLUIPA after developing a significant record of evidence of burdens on religious exercise by state and local governments in land-use regulation.  *See* H.R. Rep. No. 106-219, at 9–13 (1999).  Those burdens included frequent attempts by local governments to weaponize landmarking regulation "not for the purpose of historical preservation, but simply as a tool to thwart a religious community from carrying out its plans."  *Issues Relating to Religious Liberty Protection, and Focusing on the Constitutionality of a Religious Protection Measure: Hearing before the S. Comm. on the Judiciary*, 106th Cong. 130 (1999) (statement of Gene C. Schaerr) (citation omitted).  Indeed, Congress heard numerous examples of local governments using landmarking designations to stifle religious exercise—including "changing the interior design of [a] chapel" and replacing a church building with a new chapel better suited to the faith community's needs.  *Id.*

14

property and prevent any future nonsacred use" and citing concerns over interfering with the "internal, ecclesiastical matters of religious institutions" including the canonical process of deconsecration through demolition); *First Covenant Church of Seattle v. City of Seattle*, 840 P.2d 174, 183 (Wash. 1992) (en banc) (holding that landmarks preservation ordinance impermissibly burdened church's religious exercise both "administratively" and "financially" by restricting in various ways its ability to alter or demolish the building).

The difficult choices facing St. Philip Neri's leaders here are regrettably common today, as Catholic leaders around the country grapple with how best—pastorally and practically—to respond to population shifts and changing demographics within the Church. *Cf.* Reidy, *Churching NIMBYs*, *supra*, at 1277–81. There are no easy or one-size-fits-all answers. Canon law does not mandate that Church authorities manage deconsecrated property in one particular way, but it does require that the path chosen safeguards former houses of worship against sordid use. *See infra* Part I. To be sure, some Catholic parishes have chosen to sell, rather than demolish, their church buildings and permitted their use for secular purposes. But that fact does not undermine the sincerity of—and First Amendment protections for—the different religious determination of St. Philip Neri's leaders. Nor does it allow the government to second guess St. Philip Neri's choice among a multitude of religiously laden options—a choice that the parish concluded was the *only* way to satisfy its holy obligations completely. And it certainly is not for courts "to say that [these leaders'] religious beliefs are mistaken or insubstantial." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014). Instead, the "narrow function" of this Court is to ask whether the parish's decision reflects "an honest conviction" based on its sincere religious belief. *Id.* (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981)). The answer is plainly yes.

## CONCLUSION

*Amicus curiae* respectfully urges the Court to deny defendants' motion to dismiss.[4]

---

[4] *Amicus curiae* thanks students Noah Borgeson, Brandon Enriquez, and Cathy Kolesar for their assistance in preparing this brief.

Dated: April 8, 2026

Respectfully submitted,
*/s/ Meredith H. Kessler*

John A. Meiser (IN Bar No. 36736-71)
Meredith H. Kessler (IN Bar No. 38531-71)
LINDSAY AND MATT MOROUN
  RELIGIOUS LIBERTY CLINIC
Notre Dame Law School
1338 Biolchini Hall
Notre Dame, IN 46556
Telephone: (574) 631-8722
mhollan4@nd.edu

*Counsel for* Amicus Curiae

16

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the U.S. District Court for the Southern District of Indiana by using the Court's electronic filing system. I further certify that service was accomplished on all parties via the Court's electronic filing system.

Dated: April 8, 2026                                    */s/ Meredith H. Kessler*
                                                   Meredith H. Kessler
                                                   *Counsel for* Amicus Curiae